STATE *ex rel.* DISTRICT ATTORNEY-GENERAL, *v.* CRESCENT AMUSEMENT CO.

SAME *v.* SHORTLEY *et al.*

(*Nashville,* December Term, 1935.)

Opinion filed June 13, 1936.

Claude L. Boyd, of Waynesboro, for plaintiff in error.

George H. Armistead, Jr., of Nashville, and H. T. Shelton, of Columbia, for defendants in error.

Mr. Special Justice Davis delivered the opinion of the Court.

These bills were filed on relation of the District Attorney-General of the Eleventh Judicial Circuit, upon the authority of our statute known as the Nuisance Act (Code, sections 9324, 9325), for the purpose of preventing and enjoining the Princess Theatre, in Columbia, from conducting what is called "Opportunity Night" or "Bank Night," on which night defendant theatre proposed to give away a certain sum of money to the person holding the allegedly "lucky" ticket. The bills alleged that the scheme through which such gift of money is made and proposed to be made constitutes a gaming and a lottery under the statutes of the state, and is such offense against good morals and the public welfare as to authorize its suppression under the gaming and lottery laws of the state, and the Nuisance Act.

The bill in the first case was dismissed upon demurrer, whereupon the second bill was filed upon the theory that the injunction granted under the first bill continued in force, after appeal in the absence of a provision to that effect in the court's decree. The second bill was filed

on substantially the same grounds as the first bill, except that it included the position that the injunction on the first bill continued in effect; so we may properly dispose of both cases upon consideration of the pleadings in the first case.

The petition sets out that the defendant theatre, through its manager, Shortley, had been violating the gaming and lottery laws of the state, through the methods by which it was distributing money to patrons of the theatre, and that when attention was called to such violations, the theatre changed the scheme of distribution or gift of money, in an effort to avoid illegality, but each time retained the objectionable lottery features. The scheme finally settled upon, and complained of, as we understand it, is that the theatre has a book in the lobby thereof, which lobby any one may enter at any time, without charge, and write his name therein, a number being assigned each name, and those who purchase tickets to enter the show are urged to enter their names in this book. One night each week, designated "Opportunity Night," numbers corresponding to those opposite the names on the lobby register are placed in a receptacle, and the receptacle is taken on the stage of the theatre, where one number is drawn therefrom, and the person holding the corresponding number is awarded the accumulated cash prize. The weekly gift is $50, and if not claimed by the winner on a particular night, the fund is retained and increased weekly by the amount of $50 with the result that the cash prize sometimes amounts to several hundred dollars. The purchase of a ticket to enter the theatre is not required. It is alleged that the drawing, and award of a prize, is held at no certain hour of the night, but between 7:30

and 9:30 P. M., and it is said of necessity that one must purchase a ticket to obtain a seat in the theatre building, in order to fully participate in the drawing, as no one would stand for two hours, and hazard the chance of not being heard when called unless inside the building where the drawing takes place. It is alleged that, owing to the large number of persons who participate in the scheme, and the character and reputation of such participants, they cannot be indicted; those who participate in the drawing being equally guilty with the theatre which conducts the drawing. And it is said that the advertisement of a scheme of this kind has been forbidden admission to the United States mail. The consideration which the patrons of the theatre pay for the chance at the prize is alleged to be this: That theatregoers report the quality of the pictures on "Opportunity Night" to be much inferior to the pictures offered on other nights, and on this information the relator charges that on the nights the money is given away the defendant theatre exhibits a cheap film which costs less than that used on other nights, and this fact, together with the increased patronage from those who pay admission into the show merely in order to have a chance at receiving the cash prize, "perhaps" bear the expense of the prizes and stakes offered. The petition charges that this scheme is one merely for the benefit of the defendant theatre, its purpose being to increase the cash receipts from paid admissions to the show, and that the participants in this scheme, who expect to draw the prize, do not share the fruits of their efforts equally, and that the whole scheme is one of gaming and lottery, at the expense of the public, and is an unfair appropriation of the money of others.

The substance of the demurrer is that the scheme described is neither gaming nor a lottery, within the meaning of any statute of this state, and hence not within the purview of our Nuisance Act.

The gaming and lottery statutes, being for the protection of the morals of the people, and for the general welfare, are remedial and not penal; and as one apparent object of our Nuisance Act is the closing of houses which violate our gaming law, and the suppression of equipment used in the operation of such houses, there is no doubt that the relator is within his rights in invoking the statutes mentioned, if the facts alleged in the petition bring the case within the condemnation of the statutes relied upon by the relator.

Our gaming statute is Code, section 11275, reading as follows:

"If any person play at any game of hazard or address for money or other valuable thing, or make any bet or wager for money or other valuable thing, he is guilty of a misdemeanor."

Section 11278 makes the playing of certain enumerated games, or the keeping or exhibiting of tables therefor, a felony, but the scheme described in the petition could not fall within the meaning of any of the games prohibited under this section.

Our gaming statute has been given broad application. It has been held to apply to the game of pitching dollars, although the players did not bet, but bystanders were known to the players to be betting thereon, *Smith* v. *State*, 24 Tenn. (5 Humph.), 163; to the sale of books, where the purchaser paid probably more than the actual value of the book, with the hope of receiving a prize along with the purchase, *Bell* v. *State*, 37 Tenn.

(5 Sneed), 507; and to the sale of candy, where one paid for the candy and paid something in addition with the hope of winning a prize, *Eubanks* v. *State,* 50 Tenn. (3 Heisk.), 488. It has been held to cover a disposition of property by lottery. *State* v. *Smith,* 10 Tenn. (2 Yerg.), 272. And mint-vending machines have been held a gambling device, although said machine paid a package of mints each time it was played. *Painter* v. *State,* 163 Tenn., 627, 45 S. W. (2d), 46, 81 A. L. R., 173. And it has been said, very properly, that where the scheme resorted to is but an evasion of the statute, with the elements of gaming present, such scheme must, nevertheless, be held to be gaming, even though it be in a gentleman's dress. *Walker* v. *State,* 32 Tenn. (2 Swan), 287. In most of these older cases, full and splendid reasons are given for the suppression of gambling, and for extending the protection of the gaming statute, so as to preserve morals and promote the general welfare, wherever a scheme appears which has the elements of gambling.

In *Mitchell* v. *Orr,* 107 Tenn., 534, 64 S. W., 476, it is pointed out that if there be no unlawful device, but the hazard is upon the result of a lawful, but uncertain, event, by which one will lose and the other will gain, that it is gaming.

In all these cases, and all others we have examined, or to which we have been referred, our statute, above quoted, has been restricted to the playing of a game for money, or other valuable thing, and to the making of a bet or wager for money. In fact, the statute does not purport to cover any offense except the playing of a game, or the making of a bet or wager, for money or other valuable thing. We would not be justified in ex-

tending the terms or spirit of this statute, so as to make it apply to the facts alleged in the petition, and constitute the method or scheme described in the petition as gaming. And we think the actions complained of against the defendant theatre cannot be said to be gaming.

We have a statute which makes it a misdemeanor to make or aid in making, draw or aid in drawing, or to otherwise be interested in any lottery, under any pretense whatever. Code, section 11302. But our statute does not attempt to define what is, or shall be considered, a lottery.

■ Many definitions have been given of the term lottery. By the great weight of authority, in order that a transaction may be a lottery, three elements must be present; consideration, prize and chance. 17 R. C. L., 1222; 38 C. J., 286. See, also, Words and Phrases, First, Second, Third and Fourth Series.

We are referred, on the briefs, to many cases which define the term lottery, and apply the definition to the specific facts before the court in those cases. A review of all of them does not seem necessary or proper. Among the stronger cases relied upon by the relator is *State* v. *Danz*, 140 Wash., 546, 250 P., 37, 48 A. L. R., 1109, in which it was held, under the Washington statute, that the distribution by a theatre of produce contributed by merchants for advertising purposes, which was an additional attraction one night each week, the distribution being according to the number designated by chance on tickets furnished on admission, may be found to be a lottery, and it was said that it is immaterial that free tickets to the drawing were offered to persons not purchasing theatre tickets. Another is *Maughs* v. *Porter*, 157 Va., 415, 161 S. E., 242, from Virginia, in which

it was held that the offering of a Ford automobile, free, to the attendant at an auction sale of lots who held the lucky number drawn at such sale, was a lottery, but in which it was held, also, that on such offer to make the gift, attendance at the sale was sufficient consideration for the promise. The latter holding of this case has been much criticised. It is not supported by any authority cited in the opinion, and apparently the court did not give full consideration to such holding; the case, which was an action for the price of the undelivered automobile, in fact turning upon the conclusion that the scheme was a lottery, on which an action could not be maintained.

The defendant relies largely upon the general principles governing lotteries, and the absence of consideration paid for the prize offered, and on the authority of *Yellow-Stone Kit* v. *State,* 88 Ala., 196, 7 So., 338, 7 L. R. A., 599, 16 Am. St. Rep., 38, and *State of Iowa* v. *Hundling,* 264 N. W., 608, decided by the Supreme Court of Iowa on January 21, 1936. In the Alabama case, the defendant was convicted of operating a lottery under the Alabama statute. Defendant was conducting a medicine show, and charged 10 cents for admission. He tried to sell medicine to the patrons of his show. The Alabama court took the view that the paid admission tickets had no connection with the tickets entitling the holders to a chance on one of eight prizes to be distributed; the latter tickets being free, and having been distributed at previous performances. It was pointed out, however, that it was not necessary for the holder of a successful ticket to be present in order to get his prize, and that such prize would be delivered at a private home, if not claimed at the show. It was argued that the giving away

of these presents was in order to induce a large crowd to assemble, with the hope that they would buy medicine, or pay a fee for occupying a seat in the tent, but it is said that this would be too remote to constitute a legal consideration for the tickets on which the prizes were awarded. The Alabama court could find no element of lottery in the transaction.

The Iowa case referred to deals directly with a scheme operated by a motion picture theatre, known as "Bank Night." In that state, as in this, the statute prohibiting lotteries makes no attempt to define a lottery. The Iowa court adopted the definition found in 38 C. J., 286. The scheme for distributing money is very similar in that case to the scheme described in the petition before us. The winner of the prize must sign his name in a book, and be in such proximity to the theatre that he could claim the prize in two and a half minutes after his name was announced. That court said paying his admission to the theatre added nothing to the chance, and it could find no valuable consideration paid by the holder for the prize, and thought the scheme was not such as de-nounced by the statute of that state. *Maughs* v. *Porter, supra,* is referred to in this opinion, but not followed. That court thinks the Virginia opinion, on the question of consideration, out of harmony with the weight of authority and reason.

We do not attempt to review all the cases relied upon by either party.

We have reached the conclusion that we have no statute under which we can say that the scheme described in the petition is either gaming or a lottery, and this being so, there is nothing to bring the transaction under the terms of our Nuisance Act. The trial court

properly dismissed the petition in each case, and the decrees will be affirmed.

We do not, by this action, express our approval of the very widespread custom of distributing money at moving picture theatres, on what is variously called "Bank Night," "Opportunity Night," etc. Such practice has been denounced in more than one theatrical magazine, and showmen have denounced the screen lottery. There is good reason to support the often-expressed view of our best informed citizens that the practice in question is detrimental to the show houses themselves, as well as hurtful to the public morals. No doubt many of the most faithful patrons of the pictures are anxious to see the fad pass, and the houses devoted to their proper function of wholesome entertainment. But, under our statutes, we are not authorized to declare the practice to be gaming or the operation of a lottery.