(No. 24041.—)

THE IRIS AMUSEMENT CORPORATION *et al.* Appellants, *vs.*
EDWARD J. KELLY *et al.* Appellees.

*Opinion filed April 16, 1937—Rehearing denied June 3, 1937.*

EDMUND D. ADCOCK, EDWARD BLACKMAN, ARTHUR
GOLDBERG, and JOHN W. DAY, for appellants.

BARNET HODES, Corporation Counsel, (JOSEPH F. GROSS-
MAN, CHARLES P. HORAN, and WILLIAM V. DALY, of coun-
sel,) for appellees.

Mr. JUSTICE SHAW delivered the opinion of the court:

The Iris Amusement Corporation filed its amended com-
plaint for injunction in the superior court of Cook county,
seeking to restrain the mayor and commissioner of police
of the city of Chicago from interfering with its conduct-
ing a gift enterprise known as "Bank Night." After-
wards, the Balaban & Katz corporation and several other
theatre owners intervened as co-plaintiffs and they will all
be referred to as the plaintiffs. The defendants filed a

motion to strike the amended complaint for insufficiency, specifying seven particulars wherein it was said to be deficient, which motion was sustained by the trial court and the complaint dismissed for want of equity. The trial judge has certified that the validity of a municipal ordinance is involved, and that the public interest requires the appeal in the case to be taken directly to this court. The record is before us for review on such direct appeal.

The decision of the case having turned on the pleadings alone, we will state them with some particularity. The amended complaint alleged the original plaintiff's ownership and operation of a certain motion picture theatre in Chicago, and the intervening plaintiffs allege the operation of thirty or more other picture houses similarly situated. It was alleged that plaintiffs held licenses from the city of Chicago pursuant to section 1901 of the Municipal Code, which, in part, is as follows:

"All licenses for entertainment of any of the foregoing classes (motion picture theatres being included) shall contain a proviso that no gaming, raffle, lottery, or chance distribution of money, gift or article of value, shall be connected therewith or allowed by the person obtaining such license, or in any wise permitted to be held out as an inducement to visitors;" etc.

"When any licensed person or corporation shall be charged with having violated the provisions of his or its license as aforesaid, the mayor is directed to give the parties accused reasonable notice thereof and to inquire into the truth of said charge, and if the accusation be sustained to his satisfaction he may revoke the license of any such person or corporation, and every such person or corporation so offending shall be subject to a penalty of not more than one hundred dollars."

Plaintiffs allege that approximately one hundred and fifty theatres in Chicago have adopted an advertising plan

known as "Bank Night," the operation of which is alleged in the pleadings and plaintiffs' brief to be as follows:

"In operating Bank Night, thousands of persons outside of the theatre in the surrounding neighborhood of the theatre registered their names in certain books kept for this purpose. Each name registered in the books was given a number. Patrons attending the theatre from time to time are also permitted to register their names in said book kept for the same purpose, which patrons who have so registered are also given a number. Any one desiring to register in said books may do so without paying admission or giving any consideration of any kind therefor. Duplicates of the numbers appearing in said registration book are placed on a small ticket approximately an inch square and all of said numbers contained on said tickets are placed in a small container. All persons whose names are so registered in said registration book, whether said registration was obtained outside of the theatre or in the theatre are notified that on certain days during the performance at a certain hour one of the tickets in said receptacle will be drawn out by some person chosen from the audience of the theatre and that the person whose name is registered in the book having the number corresponding to the number on the ticket so drawn would be given a substantial cash prize by the theatre operator, varying in amounts, and the winner of said cash prize or Bank Night need not be a patron of said theatre. The winner is announced to the audience of said theatre and is also announced to all persons standing outside said theatre. Any person standing outside of said theatre whose number has been called as a winner of said Bank Night is admitted into the theatre without any admission price or cost to him and is given the cash prize. At no time does any person whose name is registered in the book, whether registered outside of the theatre or inside of the theatre, pay any consideration for having his name so registered in said registration book.

"The seating capacity of plaintiff's theatre is approximately one thousand seats, and the number of names appearing upon the registered books for Bank Night as above described, exceeds the said seating capacity several times. In operating said Bank Night only adults are permitted to register their names in said register books. Said Bank Night as described herein is in the belief of plaintiff not a violation of any of the statutes of the State of Illinois or any lawful ordinance of the city of Chicago.

"In connection with the operation of Bank Night at plaintiff's theatre, it had placed a notice in a prominent position in the lobby outside its theatre, which notice is in words and figures as follows: ·

"NOTICE.

"If you are registered for Bank Night it is not necessary to purchase an admission ticket to claim the award should you be the winner, and anyone may register without paying admission. The name of the winner will be announced in the lobby and outside the theatre and the winner will be given three minutes in which to reach the stage to claim the award. The winner may enter the theatre free of charge in order to claim the award.

"Plaintiff has operated, is operating and intends to continue to operate Bank Night at its said theatre as said Bank Night is described in the complaint, and intends to conduct drawings for Bank Night strictly in accordance with said notice and in accordance with the Bank Night system as above described."

The complaint further alleges that the commissioner of police threatens to prevent the continued operation of the foregoing scheme and that if permitted to do so, the plaintiffs will suffer irreparable injury and damage to their business; that if section 1901 of the Municipal Code of Chicago is so interpreted as to prohibit Bank Night it would violate the constitution of Illinois and of the United States

and would deprive the plaintiffs of liberty and property without due process of law.

Defendants' motion to strike asserts the validity of section 1901, *supra;* insists that the licenses issued to plaintiffs are subject to all other ordinances of the city; that Bank Night violates the terms and conditions of the licenses; that Bank Night constitutes a chance distribution of money contrary to the provisions of the ordinance; that Bank Night will attract large crowds in front of the plaintiffs' theatres, thereby creating a public nuisance and interference with travel on the public streets and sidewalks, in violation of the ordinances of Chicago; that the requirement that the winner of the award must reach the stage inside of the plaintiffs' theatres within three minutes after the announcement of the winner, when such winner is in the crowd outside of the theatre, would tend to create a disturbance of the peace and that the operation of Bank Night will tend to create congestion in and about the exits of the theatres and thereby create a fire hazard and menace to the lives of the patrons of the theatres.

For a reversal of the judgment plaintiffs advance several propositions of law, many of which do not require discussion in this opinion. Thus, they say that under the State and Federal constitutions the city may not arbitrarily interfere with private business, or impose unnecessary restrictions upon lawful occupations unless the acts prohibited are detrimental to public health, safety, morals or welfare; that conditions imposed under a municipal ordinance or license must have a reasonable relation to the police power and that the question of the validity of an ordinance falling within the police power is a judicial question. Their main contention, and one upon which there appears to be some diversity of opinion among courts of different States, is as to whether or not the scheme described and outlined in the complaint, constitutes a lottery; whether, if it is not a lottery, it is an evasion of the lottery statute, and whether

in any event plaintiffs have stated such a case as entitles them to the aid of a court of equity.

Our public policy in opposition to lotteries is ancient and is imbedded in our fundamental law. By section 35 of article 3 of our constitution of 1848, it was provided that the legislature should have no power to authorize lotteries for any purpose. In our constitution of 1870, it is provided by section 27 of article 4, that "the General Assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this State." It will be observed that the constitution of 1870 adds the words "gift enterprises," which were not found in the constitution of 1848. Pursuant to this constitutional mandate the legislature, without attempting any exact definition of the term "lottery," has made the setting up of a lottery a misdemeanor. (State Bar Stat. 1935, chap. 38, par. 401, p. 1208.) Both the constitution and the statute therefore leave the definition of the word "lottery" to its commonly accepted and generally understood meaning.

In *People* v. *McPhee,* 139 Mich. 687, 103 N. W. 174, 69 L. R. A. 505, the meaning of the term "lottery" was before the court. It was pointed out that the term is generic in nature and best left without exact definition, because as the court said, "no sooner is it defined by a court than ingenuity evokes some scheme within the mischief discussed, though not quite within the letter of the definition given." In *Dunn* v. *People,* 40 Ill. 465, we said that the word "lottery" has no technical meaning in the law distinct from its popular signification, and in *People* v. *Monroe,* 349 Ill. 270, we accepted Webster's definition, "A scheme for the distribution of prizes by lot or chance," as being sufficient for the purpose of that case. For the purposes of this one we may accept the contention of plaintiffs that a lottery consists of three essential parts or elements,—*i. e.,* (1) a chance, (2) for a prize, (3) for a price. (*Commonwealth* v. *Wall,*

3 N. E. (Mass.) (2d) 28, and authorities there cited.)
Plaintiffs admit the existence of the first two of these elements but urge that the third one is lacking; that since persons not attending the theatre and who never have paid any admission fee have a chance to win, the element of price is lacking and therefore that their scheme is not a lottery.

Plaintiffs' principal reliance is placed upon the case of *State* v. *Hundling,* 264 N. W. (Iowa,) 608, 103 A. L. R. 861, which is directly in point, except that in that case the matter came before the court on prosecution for violation of the criminal law, instead of coming,. as in this case, by way of the managers of the theatres seeking aid from a court of equity. The scheme presented for consideration to the Iowa court appears to have been identical with the one before us, except that the time for claiming the prize was limited to two and one-half minutes. The Iowa statute did not define a lottery, but the court in its discussion of that term agreed with the definition which we have accepted above. Likewise, in the Iowa case, it was admitted that the first two elements of the scheme were present, but it was denied that the element of price existed. The Iowa court came to the conclusion that the scheme was not a lottery, and its entire reason for so holding may be summed up in the following language from the opinion: "He was not required to purchase a ticket of admission to the theatre either as a condition to signing the registration book or claiming the prize when his name was drawn. In other words, paying admission to the theatre added nothing to the chance." The Supreme Court of Tennessee, in *State* v. *Amusement Co.* 95 S. W. 310, on authority of the Iowa case, arrived at the same conclusion.

The plaintiffs also rely upon the case of *State* v. *Eames,* from the Supreme Court of New Hampshire, 183 Atl. 590. In it the defendant operated a Bank Night similar to the one now under consideration, and was charged, by in-

formation, with disposing of money by lottery, under a criminal statute which clearly required that pay must be given for the opportunity to participate. The judgment was reversed, as the court said, because, under the agreed statement of facts, it could not be found beyond a reasonable doubt that the purchase of a ticket of admission was a prerequisite to participation in the drawing. Notwithstanding its conclusion, certain language in the opinion leads us to believe that had the action there been, as here, an application to enjoin the public authorities from interfering with the scheme, a different result might have been arrived at. Thus the court says: "The problem presented by "Bank Night" and similar schemes is to determine whether it is an evasion of the statute or an avoidance of it, and this question is essentially one of fact. In answering this question, we do not propose to close our eyes to reality. The test by which to determine the answer to this question is not to inquire into the theoretical possibilities of the scheme, but to examine it in actual practical operation. If, as the State contends in its brief, although this contention does not appear to be borne out by the agreed facts, 'a great majority of people pay for such privilege,' then it is an evasion and as such is not to be countenanced." The foregoing cases sufficiently illustrate the views advanced by the plaintiffs, and the reasons for the holdings upon which they are based. It will be observed that the Iowa case is entirely based upon its holding that paying admission to the theatre added nothing to the chance to win. The Tennessee case is based upon the Iowa case and adds nothing to it. The New Hampshire case is based upon the court's finding, upon an agreed statement of facts, that free participation was a reality, rather than chimerical, and was controlled by a criminal act which defined the terms

On the other side of this question we find several cases of which we will cite but a few. In *State of Washington v. Danz*, 250 Pac. (Wash.) 37, 48 A. L. R. 1109, the de-

fendant operated a moving picture show and distributed groceries and other property of value from the stage of the theatre once each week. The property distributed cost the theatre nothing, but was collected by the defendant from various stores whose compensation was derived from having their names mentioned as the goods were distributed. The distribution was by lot or chance and was known as "Country Store." Each patron of the theatre received a ticket entitling him to a chance, and there was also a card placed conspicuously at the entrance to the theatre advising the public that free tickets to the drawing might be had without the necessity of purchasing an admission ticket to the theatre. The conviction for operating a lottery was sustained, and in the course of its opinion the court said: "Nor is the fact that free tickets were offered to outsiders material in any controlling sense. None such were given out as a matter of fact, and, if there had been, it would not of itself have made any difference. If, in the flourishing days of the Louisiana lottery, its management had advertised that it would give a free ticket to the president of every bank in the city of New Orleans, that would not have changed the scheme from a lottery, whether or not any one or all of such free tickets were accepted."

In the very recent case of *Commonwealth* v. *Wall,* 3 N. E. (Mass.) (2d) 28, the defendant, manager of a moving picture theatre was convicted of being concerned in setting up a lottery for money in violation of the statute of Massachusetts and the plan under which he was operating was substantially identical with the one before us for consideration. The court pointed out that one may give his money away by chance, and if the winner pays no price there is no lottery, but added that the term "price" means something of value and not the formal or technical consideration which would be sufficient to support a contract, for which statement many authorities are cited. The court further stated that on the other hand, a game does not cease

to be a lottery because some, or even many, of the players are admitted to play free, so long as others continue to pay for their chances. The court pointed out that the test was not whether it was possible to win without paying for admission to the theatre, but whether that group who did pay for admission were paying in part for the chance of a prize. The court said, "They, [the jury,] could take a realistic view of the situation. They were not obliged to believe that all the ingenius devices designed to legalize this particular game of chance were fully effective in·practical operation. An important feature of the plan was the necessity that the person whose number was drawn should appear at once and claim the deposit. The time allowed for appearance was entirely within the control of the defendant. No definite time seems to have been fixed. A participant inside the theatre would have the advantage of immediate presence in a place of comfort. He could hear the number and the name read. He could identify himself at once. A participant outside the theatre must wait in discomfort in the hope that if his name should be drawn within he would be notified and would hear the call soon enough to crowd through toward the front of the theatre within such time as might be allowed. The object of the defendant was to fill the theatre, not the lobby or the sidewalk. We think the jury could find that the unusual crowds which completely filled the theatre on "Bank Night" paid to come in partly because they had, or reasonably believed they had, a better chance to win the prize than if they had stayed outside, that they paid their money in part for that better chance, and that the scheme in actual operation was a lottery. There was no error in denying the defendant's motion for a directed verdict."

In the case of *Glover* v. *Malloska,* 238 Mich. 216, 213 N. W. 107, 52 A. L. R. 77, the defendant had tickets printed giving. the holders thereof a chance to draw an automobile on monthly drawings. Some of these tickets were sold at

a cent each to his customers, others were given away with oil and gasoline sales, and still others were given away free. Once a month the stubs were placed in a barrel, drawing made and the winner determined by chance. The Supreme Court of Michigan held this to be a lottery and said that the fact that some of the tickets were given away free did not at all save the scheme from being a lottery or gift enterprise, within the meaning of the statute using those words; that there was a prize which was paid for, either in whole or in part, by the purchase and sale of tickets and that the winner was determined by chance. The case of *State* v. *Fox Kansas Theatre,* 62 Pac. (Kan.) (2d) 929, which was decided in December, 1936, sustains the same view.

Other cases might be added to the foregoing brief review, but we have set forth enough to indicate the division of authority and the reasons therefor. The principal case favoring plaintiff's view seems to be the Iowa case of *State* v. *Hundling, supra,* and, as we above pointed out, that decision is based upon the court's conclusion that paying admission to the theatre added nothing to the chance of winning. We believe this conclusion to be in error and that the opinion of the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Wall, supra,* contains the better reasoning. As that court pointed out, the object of the theatre owner is not to fill the lobby or the sidewalk, but to fill the theatre, and that those who paid to come in, did so, at least in part, because they had, or reasonably believed they had, a better chance to win the prize than if they had stayed outside, and that they paid their money in part for that better chance. It is certain that the prize money came from the pockets of those who patronized the theatre, and that without patrons there would be no prizes. In actual operation those who paid to get in, paid for those on the outside in so far as those on the outside had a chance to win, and the giving of free chances to those who did not

come in could not alter the basic and essential character of the transaction.

The ingenuity of the "Bank Night" scheme forcibly illustrates the dangers pointed out by the Michigan court which grow out of attempting exact definition of generic and well understood words. There are many words in the law such as "fraud," "confidence game," and others, which are their own best definition and which are better left with some elasticity lest the ingenuity of nefarious minds devise means for evading the letter of the law while transgressing its spirit. In this scheme there is present every element of the evils attendant upon mass gambling. A small stake concealed within the price of admission gives its chance for a large prize, which may become large enough to arouse intense cupidity; there is the excitement of drawing a lucky number with its attendant exultation for one fortunate individual; there is depression and disappointment for a thousand losers, many of whom must think enviously of what they could do with so much money had they won it, and there is the constant temptation to continue to play in the hope of winning. We have thus created cupidity, envy, jealousy and temptation—the very things sought to be avoided by that enlightened public policy of most of the world which has outlawed lotteries. If this evasion could be legalized for a small admission fee and a small cash prize, both the fee and the prize could be augmented to more dangerous proportions. It is not difficult to foresee that competition between theatre owners might quickly produce exactly such a result.

Quite contrary to plaintiff's argument, the element of price is present. As the Massachusetts court said, we may look at this thing realistically and sensibly. We know that those within the theatre pay for any chance anyone outside may have to win. Furthermore, we know that the chance of an outdoor participant is decidedly limited by the requirement that he reach the stage in a short time. We

know that if any appreciable number of outside persons are to participate in the drawing they must loiter on the street, obstructing normal traffic, and that they must crowd the lobby and theatre exits to the danger of those within. The price for a fair and reasonable chance to win is the cost of a ticket of admission to the theatre, which is the object of the plan, and thus a lottery is completed, even under plaintiffs' own definition and contention.

Our public policy against lotteries expressed in two constitutions, in the Criminal Code, and in the ordinance before us, is much too firmly rooted to be evaded by any chimerical device. Our conclusion is that the operation of the scheme outlined in the amended complaint constitutes a lottery and that the plaintiffs have no standing in a court of equity for its furtherance or protection.

The superior court correctly dismissed the complaint for want of equity, and its decree will be affirmed.

*Decree affirmed.*