# STATE v. J. L. STERN.[1]

October 29, 1937.

No. 31,436.

*Samuel H. Maslon, Samuel P. Halpern,* and *Myer R. Shark,* for appellant.

[1]Reported in 275 N. W. 626.

*William S. Ervin,* Attorney General, *Roy C. Frank,* Assistant Attorney General, *M. F. Kinkead,* County Attorney, *James F. Lynch* and *William F. Desmond,* Assistant County Attorneys, for the State.

*John P. Devaney, amicus curiae,* filed a brief in behalf of Allied Theatre Owners of the Northwest, Inc.

HOLT, JUSTICE.

Defendant, convicted of the offense of advertising a lottery on the 18th day of February, 1937, appeals.

The facts were stipulated and a jury waived, the charge being a misdemeanor. For a condensed statement of the facts material for a decision, this may suffice: Defendant is the principal owner and manager of a Minnesota corporation which was employed by Affiliated Distributors, an Iowa corporation, as agent for Affiliated Enterprises, a Colorado corporation, to solicit contracts from moving picture theatres to use a purported copyrighted plan called "bank night" or "bank nite" by which a drawing was had on a certain night each week, upon the stage of the theatre, for a cash prize. Defendant in behalf of his corporation negotiated such a contract for the Colorado corporation with the owners of Dale Theatre, St. Paul, Minnesota, which remained in effect from August, 1935, until after the date upon which the offense was charged. The Dale Theatre owners were to pay $7.50 a week to the Colorado corporation for the privilege of operating bank night. The theatre was to use for that purpose only such "cards, posters, register and record books, film trailers and other accessories" as should be furnished by the Colorado corporation for staging the weekly feature known as bank night. Indorsed on the contract were instructions which the theatre must strictly follow, or its cancellation would result. The here important features of the instructions are that, at least two weeks before the first bank night opens a table or desk for the register book is to be placed near the box office, over which is to be hung a large sign reading, "Register Here to Get that Free $......Bank Account at (name of Bank)." Every person is permitted to register therein without price. The doorman or usher is to call

attention to the public that they must register to get the "Free $..... Bank Account." Contact with a local bank is advised, and it is suggested that such bank furnish part of the prize. After each registered name a number is placed in succession, the names and corresponding numbers are to be transferred to record book and a coupon of each number is to be placed in a small box, and sometime during the show and upon the stage a blindfolded child is to draw a coupon from the box. The number thereon indicates the person registered who obtains the prize, if he claims it in the theatre within a reasonable time—the time fixed by the Dale Theatre was two and one-half minutes. The winner is announced not only in the theatre but also outside. If he is outside, no admission fee is required of him to enter and receive the prize. The instructions contained also a special notice to the effect that bank night was intended as an advertising plan and not as a means to provide the theatre's patrons with a prize. Therefore the instructions must be followed implicitly. The winner must be announced outside the theatre and permitted to enter and claim the bank account without any admission fee. "All persons must be allowed to register without payment of an admission fee. You must give public notice of the above." Two film trailers were furnished to be used for advertising bank nights, the purport of which was that registration and participation in bank night drawings were absolutely free and that the registration book was located in the lobby of the theatre. For one week in the latter part of December, 1936, Dale Theatre ran a film trailer reading: "In order to be qualified to win the prize [the person must be qualified to win the prize], the person must be the holder of an admission ticket purchased at the theatre on the day of the drawing." This film trailer was purchased by the owners of the theatre. On February 18, 1937, and during several months prior thereto, the Dale Theatre announced a special performance the afternoon preceding the evening of the bank night, at which matinee all persons in attendance could obtain a card upon which to register for the evening bank night prize drawing. Such cards were similarly advertised and used by a majority of the theatres operating bank night in Ramsey county, said theatres having contracts with the

Colorado corporation and making payments to defendant thereon during said period; but neither the trailer referred to nor the cards for registration were supplied or furnished by defendant or any of the corporations above named.

The assignment of error is that the facts stipulated are insufficient to sustain the findings of guilt of the offense charged.

The indictment charges defendant with advertising a lottery, a misdemeanor denounced by 2 Mason Minn. St. 1927, § 10210. The preceding section (10209) defines a lottery thus:

"A lottery is a scheme for the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether it shall be called a lottery, raffle, gift enterprise, or by any other name, and is hereby declared unlawful and a public nuisance."

The punishment for contriving, proposing, or drawing a lottery or assisting therein is imprisonment in the state prison for not more than two years, or by fine of not more than $1,000, or by both. There can be no doubt that the bank night operated by the owners of the Dale Theatre pursuant to the film trailer, the last week in December, 1936, was a lottery and a violation of § 10209 under our decisions. State v. Powell, 170 Minn. 239, 212 N. W. 169. And had the owners been indicted for violation of § 10209 for the bank night of February 18, 1937, where the purchasers of that day's matinee tickets registered on cards and thereby participated in the chance of obtaining the prize of that bank night, it is not perceived how they could have escaped conviction. The fact that other registrants for that drawing were permitted to participate without paying admission to the show could not absolve from violation of the law as to those participants who paid for the matinee tickets and by use of the registration cards could participate in the chance.

However, defendant had nothing to do with the film trailer which the owners of the Dale Theatre exhibited the last week in December, 1936, nor with the registration cards furnished matinee ticket purchasers on February 18, 1937, whereby they became participants in the bank night of that evening. The use of either was cause for

cancellation of the contract. There is nothing in the stipulated facts from which the inference can be drawn that defendant had knowledge of the violation of the instructions indorsed on the contract he negotiated. Nor is there anything to show that he had authority to cancel the contract. From the mere fact that defendant as agent of the Colorado corporation collected the $7.50 weekly which the owners of the Dale Theatre paid for license to use bank night, it cannot be inferred that he knew of or had anything to do with advertising the matinee registration.

The next question is: Was the bank night, if carried out strictly according to the contract defendant negotiated, a lottery? Our constitution bars lotteries. Art. 4, § 31, reads: "The legislature shall never authorize any lottery or the sale of lottery tickets." Not only have the legislatures heeded the command, but have enacted laws prohibiting all lotteries and gift enterprises dependent on chance. So it may be said that public policy is against every scheme that includes the three essential features of a lottery. Generally speaking, courts have reached the conclusion in civil proceedings that bank nights and schemes akin thereto are lotteries. Iris Amusement Corp. v. Kelly, 366 Ill. 256, 8 N. E. (2d) 648; State ex rel. Attorney General v. Fox Kansas Theatre Co. 144 Kan. 687, 62 P. (2d) 929, 109 A. L. R. 698; Sproat-Temple Theatre Corp. v. Colonial Theatrical Enterprise, Inc. 276 Mich. 127, 267 N. W. 602; City of Wink v. Griffith Amusement Co. (Tex. Sup.) 100 S. W. (2d) 695; General Theatres, Inc. v. Metro-Goldwyn-Mayer Distributing Corp. (D. C.) 9 F. Supp. 546; Central States Theatre Corp. v. Patz (D. C.) 11 F. Supp. 566; Affiliated Enterprises, Inc. v. Gantz (C. C. A.) 86 F. (2d) 597. There are some decisions to the contrary. See Simmons v. Randforce Amusement Corp. 162 Misc. 491, 293 N. Y. S. 745; State ex rel. District Attorney General v. Crescent Amusement Co. 170 Tenn. 351, 95 S. W. (2d) 310; Maughs v. Porter, 157 Va. 415, 161 S. E. 242; Affiliated Enterprises, Inc. v. Gruber (C. C. A.) 86 F. (2d) 958. In criminal prosecutions the weight of authority is to the effect that bank nights and similar plans to distribute prizes by chance are not lotteries in that one of the three essential elements, under statutes similar to ours and under the

common law, is absent, namely, a consideration given or paid by the participants in the chance. Defendant here concedes the presence of the elements of prize and chance, but vigorously contends that the participants in bank nights under the contract he negotiated provided for no consideration to be paid or given; in fact, particular pains are taken in the contract, the instructions, and the notices to inform the public that the chance may be had without price. In the following criminal prosecutions it was held that the schemes employed were not lotteries because the participant was not required to pay or give a price or consideration for the chance of winning the prize: Yellow-Stone Kit v. State, 88 Ala. 196, 7 So. 338, 7 L. R. A. 599, 16 A. S. R. 38; People v. Cardas, 137 Cal. App. (Supp.) 788, 28 P. (2d) 99; Cross v. People, 18 Colo. 321, 32 P. 821, 36 A. S. R. 292; State v. Hundling, 220 Iowa, 1369, 264 N. W. 608; State v. Eames, 87 N. H. 477; City of Roswell v. Jones (N. M.) 67 P. (2d) 286; People v. Shafer, 160 Misc. 174, 289 N. Y. S. 649 (affirmed without opinion 273 N. Y. 475, 6 N. E. (2d) 410); *contra,* State v. Mumford, 73 Mo. 647, 39 Am. R. 532; State v. Danz, 140 Wash. 546, 250 P. 37, 48 A. L. R. 1109; but neither case related to bank nights although similar insofar as concerned the element of consideration.

Whether a consideration is given for the chance of the prize is a question of fact. Where one who purchases an admission ticket for a bank night obtains free another ticket to participate in the chance for the prize, the court affirmed a conviction of the operators of the theatre for maintaining a lottery. People v. Miller, 271 N. Y. 44, 2 N. E. (2d) 38. The case of Commonwealth v. Wall (Mass.) 3 N. E. (2d) 28, 30, is cited as sustaining the position that bank night conducted according to the instructions of this contract is not a lottery; but we think that decision justifies a holding that the scheme devised may be found a lottery if facts appear from which a jury may find that a valuable consideration was given by those who obtained a chance for the prize. The court says the jury "could take a realistic view of the situation. They were not obliged to believe that all the ingenious devices designed to legalize this particular game of chance were fully effective in practical operation.

An important feature of the plan was the necessity that the person whose number was drawn should appear at once and claim the deposit. The time allowed for appearance was entirely within the control of the defendant. No definite time seems to have been fixed. A participant inside the theatre would have the advantage of immediate presence in a place of comfort. He could hear the number and the name read. He could identify himself at once. A participant outside the theatre must wait in discomfort in the hope that if his name should be drawn within he would be notified and would hear the call soon enough to crowd through toward the front of the theatre within such time as might be allowed. The object of the defendant was to fill the theatre, not the lobby or the sidewalk. We think the jury could find that the unusual crowds which completely filled the theater on 'Bank Night' paid to come in partly because they had, or reasonably believed they had, a better chance to win the prize than if they had stayed outside, that they paid their money in part for that better chance, and that the scheme in actual operation was a lottery. There was no error in denying the defendant's motion for a directed verdict." However, exception was sustained to the court's charge that any technical and nonvaluable consideration, "whether registration of the name or anything else," sufficed. A similar view is taken of the consideration in Iris Amusement Corp. v. Kelly, 366 Ill. 256, 8 N. E. (2d) 648, and City of Wink v. Griffith Amusement Co. (Tex. Sup.) 100 S. W. (2d) 695. The argument of the Massachusetts court appears to us sound. The plan of bank night may be advertising the theatre, but, of course, in so doing the object is to increase the sale of admission tickets so as not only to cover the prize but also to increase the profits from the theatre. Since the question whether a valuable consideration is paid by the participants in the chance is one of fact, the proof thereof must be more convincing in a criminal than in a civil action. In other respects what makes a lottery from a legal standpoint ought to be the same in every sort of a case.

But even were bank night conducted in strict conformity with the contract negotiated by defendant, a scheme that in practice developed into a lottery, defendant was not charged with contriv-

ing, conducting, aiding, or abetting a lottery. He was charged with and convicted of having advertised a lottery on February 18, 1937— a misdemeanor. The statute denouncing that offense (§ 10210) reads:

"Every person who shall sell, give, or in any way whatever furnish or transfer to or for another a ticket, chance, share, or interest, or any paper, certificate, or instrument purporting to be or to represent a ticket, chance, share, or interest, in or dependent upon the event of a lottery, to be drawn within or without the state; or who, by writing, printing, circular, or letter, or in any other way, shall advertise or publish an account of a lottery, in or out of the state, stating how, when, or where the same is to be or has been drawn, or what are the prizes therein, or any of them, or the price of a ticket, or any share or interest therein, or where or how it may be obtained—shall be guilty of a misdemeanor."

It is obvious that this section was intended to cover whatever was not included in § 10209, *viz.* isolated acts done in furtherance of a lottery, but not in the actual contrivance or conduct of the lottery itself. And the indictment in question charges a violation of the second part of the section—advertising a lottery on a particular day. There is nothing in the stipulated facts from which an inference can be drawn that defendant on that day or any other specific day advertised a lottery. For that reason, we are of the opinion that the conviction is not sustained.

Judgment reversed.

JULIUS J. OLSON, JUSTICE (dissenting).

With most of what Mr. Justice Holt has written I am in accord. But there are some matters to which I cannot agree for reasons now to be stated.

Here, as in practically all of this type of cases, there is no dispute that at least two of the elements involved in a lottery appear, chance and prize. The third element, price (or consideration), is the point of cleavage. That is why it is impossible to harmonize the decisions bearing upon this subject. Defendant's argument has for its foundation the claim that because registration was free to any-

one willing to register and that such registrant had the same chance of drawing the lucky number as one who bought a ticket to the show therefore the price (consideration) element is lacking; hence that the scheme is an advertising medium only and not a lottery.

It seems clear to me that "bank night" cannot by any stretch of the imagination be called a donation or a gratuitous distribution of one's property. Theatre owners are not generally known as "benevolent philanthropists." What the owners of the Dale Theatre sought and what defendant sold them was not a scheme to fill the lobby or the adjacent sidewalks, but rather and only to fill this theatre with paying patrons. They were employing this method to increase attendance at their theatres in order to increase profits. And that this is the result hoped for and sought to be accomplished is what they bought and defendant sold, otherwise why would they be paying their good money for this service?

"The life of the law has not been logic; it has been experience." Holmes, The Common Law, p. 1.

How can we as judges "pretend ignorance of what all mankind knows?" Robinson v. State, 185 Ind. 119, 125, 113 N. E. 306, 308. What member of this court, or anyone else for that matter, can say that bank night is not *the night* when one "must go to the movies?" What town, large or small, having a moving picture show, is not jammed to the doors on such occasions? And if the purse has increased from time to time because the "lucky" number has in the past not found any claimant, does it not follow that as each succeeding bank night approaches the crowding of the show place and the areas adjacent thereto has become a common nuisance to other citizens whose craze for getting something for little or nothing has not led them astray?

Constitutional and statutory inhibition, to which should be added plain common sense as well, combine against lotteries and gambling in all forms. Looking at this matter realistically, we cannot close our eyes to the evil results that have flowed from the bank night scheme.

In Jorman v. State, 54 Ga. App. 738, 188 S. E. 925, 927, defendant was convicted of operating a lottery. There, as here, defendant urged that bank night patrons were entitled to a chance whether they bought theatre tickets or not. The court, however, concluded (54 Ga. App. 741) :

"It cannot alter the fact that the operator may have given free chances to some without the purchase of tickets; even so, the lottery scheme as to a gift enterprise was present to all the rest, and this fact did not prevent it from being a lottery under the law of Georgia."

The court then proceeds to discuss State v. Danz, 140 Wash. 546, 250 P. 37, and quotes as follows (48 A. L. R. 1109) :

"The distribution by a theater of produce contributed by merchants for advertising purposes as an additional attraction one night each week, according to numbers designated by chance on tickets furnished with the tickets of admission, may be found to be within the prohibition of a statute defining a lottery as a scheme for the distribution of money or property by chance among persons who have paid or agreed to pay a valuable consideration for the chance, and it is immaterial that free tickets to the drawing are offered to persons not purchasing theater tickets."

In Commonwealth v. Wall (Mass.) 3 N. E. (2d) 28, 30, the court said:

"A game does not cease to be a lottery because some, or even many, of the players are admitted to play free, so long as others continue to pay for their chances."

In State v. Danz, 140 Wash. 546, 548, 549, 250 P. 37, 38, 48 A. L. R. 1109, the court said:

"If in the flourishing days of the Louisiana lottery its management had advertised that it would give a free ticket to the president of every bank in the city of New Orleans, that would not have changed the scheme from a lottery, whether or not any one or all of such free tickets were accepted."

The post office department of our government has uniformly held that the bank night scheme is a lottery upon the theory that any benefit going to the promoter of a scheme or any inconvenience suffered by a contestant such as going to a place of business to register his name and address is sufficient to constitute the element of consideration. As a consequence, the words "bank night" inserted in advertisements relating to schemes to distribute to purchasers of admission tickets or merchandise chances in a drawing for prizes is a violation of the law. Then in the very late case of Cole v. State, 112 S. W. (2d) 725, 728, the Texas court of criminal appeals held the bank night scheme there to be illegal, and amongst other things said:

"In short, we think it does not materially affect the scheme that there be a possibility that some one might get a prize who had not paid for a ticket. It is so plain as to be evident that appellant's purpose was, from no angle and in no sense, to induce people not to buy tickets to the show, but to rely on the fact that their names were on his book. Such proposition would be entirely opposed to his purpose and plan, which was—as frankly admitted by him— to increase the patronage of his show. *No sane man would believe for a moment that appellant would continue for an extended period, as appears here, to operate a scheme the result of which would or could lose him money.*" (Italics supplied.)

And in Affiliated Enterprises, Inc. v. Gantz (C. C. A.) 86 F. (2d) 597, 599, the court in speaking of the bank night plan or system as portrayed in its copyrighted sheets said: "This seems to be a subterfuge to escape the stigma of being a lottery." And further, "how can it be maintained that the supposed evasion [attempted to be afforded by the system] converted a lottery or gambling device into a mere altruistic opportunity and occasion to bestow a gift."

The evils of all lottery schemes have long been recognized. As long ago as Phalen v. Virginia, 8 How. 163, 168, 12 L. ed. 1030, 1033, the court said:

"The suppression of nuisances injurious to public health or morality is among the most important duties of government. Experi-

ence has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple."

And in 38 C. J. p. 305 [§ 35], it is said:

"Statutes prohibiting or regulating lotteries should be construed with a view to remedying the mischief intended to be prevented, and to suppress all evasions for the continuance of the mischief. Therefore, where the question presented is one of enforcing criminal responsibility, * * * the courts will ordinarily construe liberally the provisions relating to lotteries so as to include all schemes which appeal to the gambling propensities of men."

An interesting and instructive article, (Hensley) *"The Legality of Theater Bank Nights,"* is found in 1 The American Lawyer (1937) p. 5. The cases bearing upon this subject are there adequately analyzed, and the conclusion reached by the writer of that article appeals to me as being sound. I quote (p. 13):

"We must not lose sight of the fact that the important factor in the determination of the character of such a scheme as that now under consideration is the substance; the name given to the process used to effectuate the object is of no consequence. It is idle to maintain that statutory and constitutional inhibitions meant to prohibit names and not things. Whatever it may be christened, or however well it may be guarded or masqueraded by cunningly devised conditions or deceptive screens, it is, under the law, what dispassionate and pragmatic analysis reveals it to be; and theoretical applications when at war with practical functioning must be ignored and discarded. If 'bank night' differs from ordinary lotteries, the difference lies chiefly in the fact that it is more ingeniously devised to disingenuously gull gullible courts. Many courts have looked beyond the mere factitious form of the transaction, and sought out and suppressed the obnoxious substance itself. It has been aptly

said that 'the office of the Judge is, to make such construction as will suppress the mischief, and advance the remedy, and to suppress all evasions for the continuance of the mischief.' Magdalen College Case, 11 Coke 71 b, 77 Eng. Reports 1235, 1242."

Defendant was charged with "wrongfully, unlawfully and wilfully by writing, printing and the distribution of films, and in other manner did advertise and publish an account of a lottery to take place at the Dale Theatre in St. Paul" on February 18, 1937. From July 30, 1935, until and including February 18, 1937, the Dale Theatre paid to defendant (or his solely controlled domestic corporation) $7.50 per week for using the films, trailers, and other paraphernalia furnished by his principal. If, as I think, "bank night" is a lottery (albeit artfully disguised), then the conclusion must follow that defendant was properly found guilty and that the judgment below should be affirmed.

STONE, JUSTICE (dissenting).

I also dissent, but do not think that it helps consideration to characterize "bank nite" as a scheme to evade the lottery laws. Evasion is entirely legitimate if of the kind which, in operation, falls short of violation of law. That, of course, is the purpose of bank night. I think it fails.

The plan has two classes of beneficiaries. The first consists of those who do not buy admission tickets, but wait outside on the chance, which in many cases everyone knows, is exceedingly remote, that an outsider, even though the winner on a given night, may get inside soon enough successfully to claim the prize. The second class embraces those who buy tickets and so pay, not only for admission to the theatre, but also for the advantage over outsiders admission offers to the insider who wins the draw.

The latter class, I submit, "have paid," in the language of the anti-lottery statute, "a valuable consideration for the chance" which is theirs and enhanced by reason of their payment of the consideration. The obvious purpose of the scheme is in that very manner to induce attendance and to discourage nonattendance inside the theatre. So the conclusion is inescapable to me that the scheme

contemplates, and by the underlying contract provides for, the two classes of beneficiaries indicated, one consisting of those who do not pay and the other of those who do. The latter feature, in my judgment, makes the whole scheme a lottery. That being so, I think the defendant was properly found guilty because he advertised that scheme within the meaning of the statute.

PETERSON, JUSTICE (dissenting).

I concur in the dissent of Mr. Justice Stone.