Robinson, J.
 

 The Court of Appeals based its judgment upon its interpretation of the agreed statement of facts as falling short of showing a violation of the penal laws of the state, pursued wilfully, habitually and persistently; and in view of the stipulation of the duration of time consumed and the number of transactions constituting the wilful, habitual and persistent violation of law, the conclusion of that court is not illogical.
 

 In the presentation of the case here, however, counsel for the defendant in error requested that the cause be considered as though the operation of the so-called “mart” under the Three A System had been wilfully, habitually and persistently pursued for a long period of time, and expressly waived any claim of failure of proof in respect to the length of time the “mart” had been conducted, or the number of races run or the number of so-called sales of dogs made.
 

 One Joseph H. Adams claims to be the author of the scheme, detailed in a pamphlet distributed to his patrons and appearing in the statement' hereto as Exhibit A, and thinks so well of it that he has ap
 
 *531
 
 plied for and received from the United States Patent Office a copyright thereon.
 

 The scheme purports to have for its object the sale of horses and dogs at auction and the racing of horses and dogs for public entertainment.
 

 The transactions here under consideration relate to dogs only. The pamphlet asserts that the plant should properly be termed a “mart.”
 

 The first paragraph of the pamphlet describing the scheme provides for the sale, at auction, of “any” horse or dog, in the way sales at auction are usually conducted; that is, the animal is offered for sale at the price the buying public determines it is worth.
 

 Reserving our opinion as to why the first paragraph appears in the pamphlet as a part of the scheme at all, there is nothing about that paragraph which requires the further consideration of the court. None of the balance of the pamphlet relates to “any” horse or dog, but relates only to horses and dogs having “an aptitude for racing,” and details a scheme purporting to be for the sale of such animals at auction only in connection with the racing of such animal, and provides as a condition to entering such animal in a race that it must be entered at “a specified sale price.” The pamphlet does not disclose whether the owner of the animal has the privilege of specifying such price, or whether that right is reserved to the operator of the “mart.” It is significant, however, that the word “price” is used, instead of “value,” and it is the apparent intention of the author of the scheme that the “specified price” be an arbitrary price.
 

 The scheme as disclosed by the pamphlet offers
 
 *532
 
 to the patrons of the “mart” not an opportunity to purchase animals “having an aptitude for racing,” upon the judgment of value pronounced by the bidding public, but an opportunity to purchase such an animal only at a specified arbitrary price, which price need have no relation to actual value, and then provides, if no one bids the arbitrary fixed price for the whole of such animal, or a half or a fourth thereof, then a wholly different plan for acquiring an “interest” in such animal be offered. The purchaser is directed to go to booths provided by the operator of the “mart,” where he may buy tickets of such operator at any price he may desire to invest, upon the top front of which ticket is printed in large letters the word “First,” and a number which corresponds with the number given the animal on the race program, the name of the “mart,” two initials, the purpose of which is not disclosed, and two figures indicating the sum paid therefor; and on the back, in fine print (5 point, or pearl type), is printed what the agreed statement of facts states is as follows:
 

 “For the sum indicated on the face hereof the undersigned hereby sells and transfers to the holder hereof a like interest in the dog whose name appears on a program issued by the undersigned (of even date) opposite a number corresponding to the number hereon. The interest herein sold to be held subject to a first and second mortgage duly recorded. This contract is made and the holder of this bill of sale accepts the same subject to the following condition: such holder within four hours from the acceptance of this contract shall either purchase the entire interest in said dog or surrender this bill of
 
 *533
 
 sale at the appraised value thereof as disclosed by an appraisal made by three competent appraisers.
 

 “Copyrighted by J. H. Adams.
 

 “Jos. H. Adams.”
 

 It is not entirely clear whether, if a purchaser should bid and pay “the specified sale price” of the entire animal, he would thereby obtain control of the animal; but the possibility of the happening of any such contingency is obviated by the process of fixing such “specified sale price” without reference to the animal’s actual value. It affirmatively appears that a purchaser of anything less than the entire animal does not thereby obtain control over the animal — nor does he if he purchase at a booth a title to any portion of such animal, or to anything which may ripen into a title to any specified fraction of such animal — except upon the performance of certain named conditions, the performance of which is wholly impracticable, and if not under every circumstance utterly impossible it is always in the power of the operator of the “mart” to make such performance impossible.
 

 The provision purporting to be for the sale of interests in two promissory notes, secured one by a first mortgage upon the animal entered in the race and one by a second mortgage upon such animal, is, if possible, even less plausible. We do not have a copy of the face of such tickets and do not know whether or not they bear the words “Second,” “Third,” and all three corresponding to the printing on the back of the tickets which we do have; but we infer that corresponding to the words appearing upon the ticket purporting to be issued to the purchaser of an interest in the animal himself, which bears the word
 
 *534
 
 “First,” such, tickets do bear the word “Second,” corresponding to the purported purchase of an interest in the first mortgage, and the word “Third,” corresponding to the purported purchase of an interest in the second mortgage, and the words “First, Second and Third,” corresponding to the purported purchase of an interest in the bill of sale, the first mortgage and the second mortgage.
 

 While the pamphlet is designed to create the impression that the tickets sold at the booth represent certain fractional parts of a definite whole, to wit, the fractional part of the specified entrance price, the face value of the first mortgage or the face value of the second mortgage, or the aggregate value of all three, a careful analysis of the language discloses that such tickets in fact bear no relationship to such fixed price or face value for any purpose. The tickets purport, according to the pamphlet, to bear some relation to an appraisement value, made after the race is run, with reference to which the pamphlet specifically provides:
 

 “(d) The board of appraisers in fixing said appraisement shall take into consideration the fact that a winning animal is more valuable than one' losing. The value so fixed by them shall be determined to some extent by the relative positions of the competing animals and all bills of sale shall be redeemable in cash whether on animals winning or losing. ’ ’
 

 From this it becomes manifest that the only things the tickets can relate to are the number of tickets sold in each race, the amounts paid therefor, the character of the tickets and the positions in which the competing animals finished the r^ce.
 

 
 *535
 
 The appraisement of the animals by the appraisers appointed, one by the operator of the “mart,” one by the owner of-the' animal, and the third by no one knows who, is but a device to translate the pool accumulated from the sale of the various forms of tickets — which correspond in fact, although not in form, to the four kinds of pari mutuel tickets (in the vernacular, to win, to place, to show, and across the board) — into a valuation of the various competing dogs for the purpose of a redistribution of the pool according to the relative positions in which such animals finished, the larger proportion going to the holders of tickets upon the animals that have finished the race in the position named by the purchaser at the time of the purchase as indicated on the ticket.
 

 The pamphlet detailing the scheme is not capable of an interpretation with reference to “animals having an aptitude for racing” that the sale of such animals or any interest therein is any part of its purpose.
 

 Manifestly the scheme was devised and the pamphlet printed for the self-serving purpose of affording its author or operator a defense in a court of justice where the legality of the operation of the scheme is being questioned. It not only falls short of accomplishing such purpose in this cause, but, like the monster of Frankenstein’s creation, it affords the very evidence which requires a judgment of ouster.
 

 The operation of the scheme clearly violates Sections 13062 and 13063, General Code, and it being stipulated that the operation of the scheme was wilful, habitual and persistent, a ease of misuse of its
 
 *536
 
 franchise to do business in the state of Ohio is made against the defendant in error. The judgment of the Court of Appeals will be reversed and a judgment of ouster entered.
 

 Judgment reversed and judgment of ouster entered.
 

 Marshall, C. J., Jones, Matthias, Day, Allen and Kinkade, JJ., concur.