TROY AMUSEMENT CO., APPELLANT, *v.* ATTENWEILER ET AL., APPELLEES.

(Decided March 13, 1940.)

*Messrs. Faust, Faust & Faust* and *Messrs. Shipman & Shipman,* for appellant.

*Mr. Michael E. Norris,* for appellees.

GEIGER, J.   This matter had its inception in the Court of Common Pleas of Miami county, Ohio.

Inasmuch as the matter was there decided on a demurrer by the defendants to the petition, it is necessary to set out the allegations of the petition with such minuteness as will enable us to determine whether the petition states a cause of action.   Had the defendants answered and had the plaintiff thereupon demurred to the answer, we would have had a broader basis upon which to ground our opinion.   Considering the general interest in the question, such a proceeding might have been advisable.

The petition recites that the Troy Amusement Com-

pany is a corporation, the business of which is the ownership of a theater and the showing of motion pictures; that in connection with the business, plaintiff for more than three years has held, on one night each week, a program designated as "bank night" which is alleged to be an advertising plan designated to stimulate public interest and good will in the motion picture industry and particularly in the Mayflower Theater of Troy, Ohio, operated by the plaintiff.

It is alleged that at the start of the "bank night," plaintiff placed in the lobby of its theater in Troy, Ohio, a registration book and every adult member of the public was invited to register so as to be eligible to participate in winning the bank account given each week; that no charge of any kind was made for registering and every person registered was given a number, which was held by such person as long as "bank night" continued.

Each week one ticket containing a number identical with one in the patrons' register book was withdrawn from a wheel which contained the individual numbers of all patrons who had registered. The person having the number drawn was required to be present within three minutes after the announcement of the number and claim the bank account; no charge or fee was ever made in order to participate in the drawing, the only condition being that the person whose number was called must appear within the specified time and claim the same. In the event the person whose number was drawn was not in the theater, the number was announced outside and if the person who held the number was on the outside and came to the theater within three minutes, he was admitted to the theater without charge and allowed to claim the account.

It is alleged that the defendant, Andrew Attenweiler, in June, 1939, filed a civil action in the court of a justice of the peace for the recovery of $10.40, representing the amount of money paid by him to the

company over a period of 52 weeks for the purchase of tickets entitling him to an interest in "bank night" which the defendant in his petition alleged was a lottery. It is also alleged that he further asked for the recovery of $100 damages and that the civil action was tried before a jury and resulted in a verdict for the defendant company "and said jury by its verdict found that the said 'bank night' is not a lottery."

It is further alleged that defendant Attenweiler filed an affidavit before the mayor of Troy for the arrest of the manager of the Troy Amusement Company, claiming that he, as manager, was guilty of running a lottery and a gambling device known as "bank night"; that upon a plea of not guilty the manager was bound over to the grand jury of Miami county where the matter is still pending; that, at the hearing before the mayor, defendant Attenweiler filed an affidavit for a search warrant which the mayor refused to issue; that thereafter defendant Attenweiler appeared before a justice of the peace and filed another affidavit for a search warrant as well as a warrant for arrest of the manager; that the constable thereupon entered the place of business of the company while the theater was operating, with a large number of patrons present, and sought to arrest the manager on the warrant and to search the theater and seize the equipment used in connection with the operation of "bank night"; and that the search warrant was unsigned and for that reason was not enforced, but will be corrected and enforced against the plaintiff unless defendants are restrained.

It is alleged that "bank night" is not a lottery; that it is a legitimate part of the business of operating a moving picture theater; that it is for the purpose of creating good will among the patrons; that if the same is interfered with by vexatious suits and arrests and searches and seizures, the plaintiff's business will

be irreparably damaged; and that plaintiff has no remedy at law for the recovery of its damages.

It is alleged that "bank night" has been operated by the plaintiff for some years past, publicly and in the presence of thousands of persons in Troy and its vicinity and that plaintiff has made no effort to deny the use of the equipment for drawing the tickets, together with the numbered stubs from the books of registration containing the names of its patrons.

It is asserted that there is no reason for the issuance of the search warrant or the seizure of the equipment; that its possession by the company will not injure the prosecution in connection with the criminal case; and that if the equipment is taken such taking will irreparably damage the business of the plaintiff.

It is stated that the only purpose of defendant Attenweiler in filing the numerous affidavits for arrest and affidavit for a search warrant and seizure and the institution of vexatious litigation is solely to injure plaintiff's business, good will and reputation; that the loss of business if the searches and seizures are continued and such utensils taken, and numerous affidavits filed, will amount to thousands of dollars; that defendant Attenweiler does not have sufficient property to compensate plaintiff for its damage, in the event the courts determine that the affidavits were wrongfully filed; that therefore the plaintiff has no adequate remedy at law; and that unless defendant Attenweiler is restrained from filing further affidavits in any court on his claim that "bank night" is a lottery, and unless the justice and constable are restrained, the plaintiff's business will be irreparably damaged with no adequate remedy.

Plaintiff further says that the defendant, Michael E. Norris, has acted as attorney for the defendant, Attenweiler, through all such litigation and as such attorney has advised and encouraged such litigation for

the sole purpose of vexing, harassing and causing injury to the business of plaintiff and has further threatened to and will, unless restrained, continue to issue or cause to be issued, through himself or other sources, warrants for searches and seizures to the irreparable damage and injury of the plaintiff.

Plaintiff prays that a temporary restraining order be issued restraining the defendant officials from molesting and interfering with its business and making any searches and seizures, and that defendant Attenweiler be enjoined from filing any further affidavits for searches and seizures of any equipment used by the plaintiff; that defendant Norris be restrained from advising, instituting or causing to be instituted any further affidavits for the seizure of any equipment used by plaintiff in connection with "bank night" and that upon final hearing the restraining order be made permanent.

A temporary restraining order was issued against all defendants.

To this petition the defendants demurred for the reasons: (1) That the petition does not state facts sufficient to constitute a cause of action; (2) that the court has no jurisdiction of the subject-matter; and (3) that the relief prayed for can not be granted under the pleaded facts.

At the same time a motion was filed by the defendants that the court dissolve the restraining order for the reasons given.

On November 20, 1939, a journal entry was filed to the effect that the court found the demurrer well taken, in that the petition failed to state facts sufficient to entitle the plaintiff to the relief prayed for. It was therefore ordered that the demurrer be sustained and the temporary restraining order be dissolved. The plaintiff not desiring to plead further, final judgment was entered for the defendants and it was ordered that

the petition be dismissed, and the defendants recover their costs.

Thereupon within proper time the plaintiff gave notice of its intention to appeal upon questions of law and fact. A proper appeal bond was given. The temporary restraining order was allowed in this court and a demurrer, as in the court below, was filed in this court.

We have before us the opinion of the court below in which the court sets out at length the reasons for the finding made by it, and cites many cases pro and con upon the question as to whether "bank night" is a lottery forbidden by the statute.

We find no formal assignment of errors by the plaintiff, but elaborate briefs have been filed by each side of this controversy, so that the errors complained of are apparent.

We will later cite the cases claimed by each side to support its position. They are so numerous that time will not permit a detailed examination and we shall confine our comment largely to those that have been decided in Ohio.

It will be observed that the plaintiff in its petition repeatedly uses the phrase "bank night." We think that there is ample justification for this court to take judicial notice of what the operation, so designated in connection with motion pictures, really means in its broadest application. However, inasmuch as this case is to be determined upon the demurrer to the plaintiff's petition, we disregard any knowledge we individually may have as to the operation of this device and confine ourselves to the narrower limits of the allegations of the petition. This, of course, does not exclude consideration of pertinent cases which may throw light upon the proper determination of the question.

That lotteries have been long condemned in the state

of Ohio appears from the provisions of the present Constitution, Section 6 of Article XV.

"Lotteries, and the sale of lottery tickets, for any purpose whatever, shall forever be prohibited in this state."

The sections of the statute relating to gambling may be found in Chapter 14, Sections 13054 *et seq.,* General Code.

The more pertinent provision relating to the matter now before us is Section 13063, General Code. This section provides in substance that whoever sells or disposes of a ticket or device representing an interest in a lottery, "policy" or scheme of chance by whatever style or title denominated or known, shall be punished as therein provided.

Section 13064, General Code, provides, in substance, that whoever establishes, promotes, acts as "backer" or "vender" for or on account of or is in any way concerned in a lottery, "policy" or scheme of chance by whatever name known or by any such means, sells or exposes for sale anything of value shall be punished as therein provided.

Section 13066, General Code, provides, in substance, that whoever exhibits for gain a gambling device for the purpose of gambling or allows it to be so used shall be punished as therein provided.

Section 13067, General Code, provides, in substance, that whoever publishes an account of a lottery or scheme of chance by whatever name denominated, stating when or where it may be or has been drawn, or the prizes therein, or showing where a ticket may be obtained or giving publicity to such lottery or scheme of chance shall be fined as therein provided.

The constitutional provisions and the several statutes above enumerated were not passed with any special reference to the matter here under consideration as all were passed long before the advent of the mo-

tion picture and "bank night," now so extensively used in connection therewith.

It will also be observed that neither the Constitution nor the statutes attempt to describe in detail the devices or schemes that are prohibited. The Constitution prohibits "lotteries" but gives no definition of what a lottery is. The sections which we have noted make it an offense to dispose of a ticket or device representing an interest in a lottery, policy or scheme of chance, or to promote such or exhibit for gain a gambling device or advertise a lottery or scheme of chance or give publicity to such lottery or scheme of chance by whatever name, style or title denominated or known.

The design of these provisions is to cover every device or operation that may fall within their inhibition, without attempting to definitely define any of the forbidden transactions but to provide restraint for any such offenses, as the same may be developed and promoted after the passage of the constitutional provision or the enactment of the statutes.

The Ohio statutes require us to make an examination of what constitutes an interest in a "lottery," "policy" or "scheme of chance" or the exhibition for gain of a "gambling device" by whatever name denominated. Although we find numerous decisions of sister states in reference to "bank night," we find none in Ohio definitely covering this alleged offense, with the exception of the instant case. This requires that we determine, if possible, from Ohio decisions whether the transaction now in question falls within any of the prohibited devices or schemes.

We shall not comment upon the questions at length, leaving a more extensive examination to those who may be interested.

*Hooker* v. *DePalos*, 28 Ohio St., 251, holds that a contract for the sale of lands, which are to constitute

prizes in a lottery scheme or "gift enterprise" to be paid for in part by tickets in such lottery, is against public policy and illegal. This case deals with what is broadly denominated a "gift enterprise," but it is also held that under the facts there is a "lottery." Chief Justice Scott, delivering the opinion states, in substance, that there is no room for doubt that the contract was wholly illegal and void. By its terms, it appears that one of the parties agreed to sell, and the other to purchase a tract of land, for the express purpose of having it subdivided into lots which should constitute prizes in a lottery or scheme of chance or "*gift enterprise.*"

*Stevens* v. *Cincinnati Times-Star Co.*, 72 Ohio St., 112, is of value. This opinion involves three cases in the court below, each against one of the newspapers, and they are treated as a single case in the Supreme Court. Judge Spear, delivering the opinion of the court calls attention to the difference, on page 145, where he says, in substance: It will be noted that the allegation against the Times-Star is that 24 cents of the 50 cents paid were for subscription and that the remaining 26 cents were to go into a fund which was to constitute the fund from which the prizes were to be paid. The prizes by the other companies were to be paid from their own funds and no subscription to either newspaper was required. "But it is believed that there is no essential difference in the questions of law presented by the several petitions." It seems to us that the statement there made has a bearing upon the question as to whether the offense, to be completed, requires that those who are to participate in the prizes must, in some way, pay for that privilege. The one newspaper required a contribution of 26 cents out of each 50 cents to go into the fund, while the two other newspapers had no such requirement as to a contribution and yet the court held that there was

no essential difference. On page 146 the court queries, "Is the project a lottery, or an unlawful gaming scheme of any kind?" The court points out that the sections of the statute interdict publishing in any way an account of any lottery or scheme of chance of any kind stating when or where the same is to be drawn, or the prizes therein, or in any way giving publicity to such "lottery" or scheme of chance, the vending or disposing of any ticket, or device of any kind, representing any interest in any lottery or scheme of chance of any kind, or the promoting of any scheme of chance of any kind or description by whatever name known.

The judge, on page 147, examines definitions of the word "lottery," one to the effect that where a pecuniary consideration is paid and it is determined by lot or chance, according to some scheme held out to the public, what and how much he who pays the money is to have for it, that is a lottery. Another definition is, in substance, that a lottery is a sort of gaming contract by which, for a valuable consideration, one may by favor of the lot, obtain a prize of a value superior to the amount or value of what he risks. The Michigan court (*People* v. *Elliott*, 74 Mich., 264), the opinion of which is approved, states that a lottery "is a scheme by which a result is reached by some action or means taken, and in which result man's choice or will has no part." It will be observed that the first two definitions involve the payment of a consideration, while the last holds that a lottery is a scheme by which the result is reached by chance without reference to the payment of a consideration.

On page 148 of the *Stevens case, supra,* the court comments upon the case of *Horner* v. *United States,* 147 U. S., 449, where the Supreme Court says:

"Although by the bonds in question, Austria attempted to obtain a loan of money, she also undertook

to assist her credit by an appeal to the cupidity of those who had money, and offered to every holder of a bond a chance of obtaining a prize dependent upon lot or chance.''

Judge Spear comments that ''It is easily within bounds to conclude that if the dominating, determining element is one of chance, that element gives character to the whole scheme.'' It is stated, on page 150, that it would seem not difficult to reach the conclusion that the project was, in essence and reality, a scheme of chance, even though it involved the elements of skill, as it is clear that the controlling element is mere chance. It suffices that under the laws of Ohio, these guessing contests were all of them unlawful and within the condemnation of the statute. The vice of the project lies in the payment of money for the opportunity to win more money by scheme of chance. It is not simply the winning of prizes that the statutes seek to inhibit. There may be such contests in which there is no element of gambling. If the contestant risks nothing, it is not considered that the function embraces any gambling element, but where the players make up by payment of money or other thing of value, a purse which affords the prizes, as in the ordinary raffle, the game is a gambling game. At page 152 of the *Stevens case, supra,* Judge Spear further states:

''All highly civilized peoples recognize the evils to society arising from the encouragement of the gambling spirit, and it is for the purpose of discouraging this vice and preventing the spread of it, that laws are passed in other states like the Ohio statutes to punish and prohibit. Such laws are and should be interpreted and enforced by our courts in a way calculated to secure the object sought.''

*State* v. *Bader,* 24 N. P. (N. S.), 186, holds that a scheme whereby an automobile is given away by means of a drawing of tickets, which were given to purchasers

of meals at a restaurant, as well as to a few others who came in without purchasing meals, which scheme and drawings are admitted to be inducement for people to patronize the restaurant, is a lottery, and in violation of the provisions of the Code. While this case is by an inferior court, there is much in it of value and the facts are suggestive of those involved in the case at bar. The court states, on page 188, that the question to be decided is whether the term "lottery" as used by the statute and ordinance embraces the distribution by lot of a prize among the holders of tickets, some of whom received their tickets contemporaneously with purchases made by them and without additional charge, and a very small minority of whom received tickets without any charge, and without making purchases. The court gives a definition of "lottery" as a scheme for the distribution of prizes by lot or chance, or a scheme by which a result is reached by some action or means taken and in which the result of man's choice has no part. A further definition is a scheme for the distribution of property by chance among persons who have paid or agreed to pay a valuable consideration for the chance. The court states that three essential elements of a lottery are (1) prize, (2) chance and (3) consideration. The first two elements being conceded, the question before that court was whether there was a consideration, moving from the recipients of the tickets, to the defendants. The court cites many cases covering the question of consideration, among them *Brooklyn Daily Eagle* v. *Voorhies*, 181 F., 579, 581, where the court says, in speaking of the question of consideration, that it does not mean that pay shall be directly given for the right to compete. It is only necessary that the person entering the competition shall do something or give up some right sufficient to comply with that requirement. Nor does the benefit to the person offering the prize need be directly

dependent upon the furnishing of a consideration. Advertising and the sales resulting thereby, based upon a desire to get something for nothing, are amply sufficient as a motive. The court quotes the case of *Equitable Loan & Security Co.* v. *Waring,* 117 Ga., 599, in reference to consideration, to the effect that it need not be great. " 'It may be money or other things of value. Sometimes the attracting of custom to one's business, or other benefit to the person conducting the scheme[,] is held to be sufficient, [although no] money is paid directly for the ticket, lot or chance.' " The court concludes that the scheme under question is a well planned lottery, often called a "gift enterprise." The claim that the tickets are given away free was a mere "smoke screen" to conceal the real character of the undertaking. The tickets were not free in the sense of being given without consideration. To obtain them in the ordinary course, a person was compelled to purchase a meal. A very few were compelled to walk a certain distance through the restaurant to get them. The court says the real injury to the people of the state of Ohio, in the operation of such lotteries, is the inducement offered to arouse the gambling spirit. Persons believed they were going to get something for nothing. This is the evil in all schemes of chance, no matter under what novel or devious methods they are conducted. The cupidity of people is aroused and they all rush to obtain a chance, worth perhaps more than a thousand times that which they venture.

*Fisher* v. *State,* 14 Ohio App., 355, holds that to constitute a lottery, three elements must be present. There must be consideration, giving of a prize and the winning must be determined by chance.

*The "5"-Spot Short Range Gun Clubs of America, Inc.,* v. *Rinehart,* 56 Ohio App., 259, 10 N. E. (2d), 450, is an interesting case although not directly in point on the present question.

There are quite a number of cases in Ohio involving slot machines or so called vending machines which have much of value in reference to what may be considered gambling.

*Snyder, d. b. a. Superior Confection Co.,* v. *City of Alliance,* 41 Ohio App., 48, 179 N. E., 426, holds that gambling statutes should be liberally construed.

See *State* v. *Krauss,* 114 Ohio St., 342, 151 N. E., 183; *Myers* v. *City of Cincinnati,* 128 Ohio St., 235, 190 N. E., 569; *Kraus.* v. *City of Cleveland,* 135 Ohio St., 43, 19 N. E. (2d), 159; *Knull* v. *McCrery, Mayor,* 29 Ohio Law Abs., 334.

While the slot machine cases may not directly bear upon the case at bar, yet they demonstrate that many ingenious devices will be introduced to avoid court holdings that a certain class of slot machine is a gambling device.

*State, ex rel. Ely, Pros. Atty.,* v. *Falls Cities Amusement Co.,* 124 Ohio St., 518, 179 N. E., 405, 79 A. L. R., 568, is illustrative of the length to which those seeking to avoid the provisions of the statute will go in their attempt to avoid the penalty. Without detail, this involved what was known as dog races. The scheme was elaborately devised, in order to escape the statute. The player was to purchase an undivided interest in each dog, which upon the determination of a selected board as to its value, would be resold to the operators at a greater or less price than the price paid by the purchaser, depending on whether that particular dog won or lost the race. It is rather irritating to be confronted with a device so transparent with the hope that intelligent courts would be led to the conclusion that gambling was not involved in the purchase and sale of an undivided interest in racing dogs, and it is quite refreshing to discover with what clearness Judge Robinson, delivering the opinion of the court, penetrated the disguise.

Returning now to the facts involved in the case at

bar, as disclosed by the petition, we may summarize, that the plaintiff is the operator of a moving picture theater operating in connection therewith, for one night each week, a "bank night," for the alleged purpose of stimulating public interest and good will in the motion picture industry and especially that operated by the plaintiff. The petition, perhaps inadvertently, recites many indicia of a gambling device. It is alleged that a registration book was placed in the lobby where every adult member of the public was invited to register, so as to be eligible to participate in *winning the bank account* given each week; that a ticket containing the number assigned to a patron so registering was withdrawn from a wheel, which contained the individual numbers of all persons who had registered, and thereupon the prize was bestowed upon a person present or who might be summoned within a short period. It is well known, but possibly not alleged in the petition, that, if the person whose name is drawn is not present or can not be found within the given time, the prize that would otherwise have been awarded to him is carried forward to the drawing on the succeeding week and that in this way, the prize becomes each week more enticing to those seeking "something for nothing."

It is alleged that "bank night" is not a lottery and is a legitimate part of the business of operating a motion picture theater; and that if the business is interfered with by vexatious suits, the plaintiff's business will be damaged to the extent of thousands of dollars.

It is urged that inasmuch as the patron enters the theater by paying the usual price for a ticket, that he does not thereby pay any consideration for the chance of participating in the prize by having his name drawn from a wheel. The plaintiff has asserted that if it is deprived of the right to operate the scheme it will lose thousands of dollars. Whose thousands of dollars

does it lose that are paid in excess of what would be paid were the scheme not in operation? Manifestly, the money of the patrons who have been lured, by a hope of winning, to go to the picture house in larger numbers than if there were no prize offered. The situation is quite similar to that presented in *State v. Bader, supra,* where a ticket was given to each patron of a restaurant which entitled him to a chance upon an automobile. It might equally be said that when he went to the restaurant, he bought food, which he would buy were no such chance offered, but as the court points out and as the defendant admitted, many more people went to the restaurant for the purpose of getting food because they thereby acquired a chance upon the automobile. The people who go to a motion picture house on "bank night" may have a proper desire to see the picture, but it can not be denied that there is mixed with their desire to see the picture, a distinct hope that they may be the fortunate winner of the prize and that this hope, although long deferred and infrequently realized, is a moving incentive for the payment of the price of admission. While not stated in the petition, it is well understood that the proprietors constantly keep before the patrons the lure of the increasing prize to be awarded by virtue of the fact that someone whose name had been drawn was not present. This information has a double purpose, one to promote the hope of a larger reward at the next drawing and the other to produce a firmer resolve on the part of a patron never to take a chance of losing a prize by being absent when his name may be drawn from the wheel.

Whether we are correct in denominating the scheme a "lottery" and holding that there is a consideration paid by the patron for the chance of winning we cannot avoid the conclusion that the drawing is a "scheme of chance," prohibited by the statute.

As we have pointed out, the statutes cover more

than the operation of a lottery. It must be admitted, without argument, that the selection of a name by the turn of a wheel, which secures the acquisitor a large money award is a "scheme of chance." The statutes penalize any one who sells or *disposes of* a ticket representing an interest in a scheme of chance. The phrase, "disposes of" used as it is, in connection with the word "sells," indicates that one may be guilty of an offense against the statute by gratuitously disposing of a ticket or device representing an interest in a scheme of chance. It is admitted by the petition that the plaintiff promotes and acts as backer of a scheme of chance and exhibits the same for gain. The plaintiff publishes an account of the scheme, stating when the prize may be drawn, the prize to be secured and gives publicity to such a game of chance and exhibits the paraphernalia used for gain. It would be idle to discuss the question whether the plaintiff, in promoting the scheme, does so "for gain." It is not engaged in a public philanthropy. If it were, it would not seek the protection of the court in order to be permitted to distribute, as a bounty, large sums of money. We are driven to the conclusion that even though the patron goes to the theater for the sole purpose of seeing the picture and does not pay a portion of the admission fee for the purpose of participating in the prize drawing, yet there is a violation of the statute in the other features which we have pointed out.

The element of advertisement and increased patronage is sufficient consideration flowing to the operator to bring the transaction within the condemnation of promoting and advertising a scheme of chance.

As an argument why the particular operation is not either a lottery or scheme of chance it is asserted that certain individuals, who, through thrift or otherwise, remain in the lobby or in the street adjacent ready for the call of lady luck, are equally entitled to

the prize with those who pay their money and enter the theater. This argument seems to us trivial. The fact that such individuals did not pay the price and enter the theater might be a good defense if they were charged with gambling, but it certainly can be no defense to one who is operating a scheme of chance. The participation in the scheme of chance is not dependent upon those who may or may not have paid an admission. We may entirely disregard the payment of the admission fee for the purpose of seeing the picture and simply consider whether those present had a chance to win a prize by the turn of a wheel, which produced for them a lucky number and it would still be the operation of a scheme of chance if some value inures to the proprietor .

It is well understood, although possibly not admitted in the petition, that a large number of people register their names and buy tickets for an afternoon performance, where the presence of a person is not required at the drawing or at any other time, for the sole chance of winning the prize. This, of course, is a pure gamble.

This court has no desire to, in any way, interfere with the pleasurable sensation that the people get from anticipating a big reward for a small outlay. That spirit is prevalent in human relations, but it appears to us that the state of Ohio has definitely taken the stand that gambling, either in a lottery or scheme of chance, is against public policy and has provided against the offense by appropriate statutes.

Having determined that the scheme in question falls within the provision of the statutes, the next question is whether a court of equity will restrain the activities of the defendants, which are sought to be enjoined.

A court of equity will not extend its powers to protect a gambling enterprise from unfair competition.

The *"5"-Spot Short Range Gun Clubs of America* v. *Rinehart, supra.*

The law will not aid a party to a lottery contract either in its enforcement while executory or in its rescission when executed. *Hooker* v. *DePalos,* 28 Ohio St., 251.

Injunction will not lie to prevent an officer of the law from enforcing an order discontinuing the use of gambling device. *Snyder* v. *Swope,* 23 Ohio Law Rep., 361.

A chancery court will not take jurisdiction by injunction to restrain a municipality from enforcing a penal ordinance. *East Hill Coal & Supply Co.* v. *City of Cincinnati,* 19 Ohio App., 396. 1 High on Injunctions (4 Ed.), 29, 85, Sections 20 and 68. 14 Ruling Case Law, 426, Section 130 *et seq.*

We find the best statement in *Kahn* v. *Walton,* 46 Ohio St., 195, 20 N. E., 203, where Judge Williams, on page 207, in speaking of an attempt to enjoin a transaction incident to a gambling contract, says:

"But what standing has the plaintiff in a court of equity? The transactions upon which he founds his claim for relief were unlawful; and the remedy he seeks, is protection against the consequences of his own participation in them. In such cases, equity keeps its hands off, and leaves the parties where it finds them. It is a fundamental rule of equity, that parties wanting its aid, must come with clean hands. Courts of equity require honesty, good faith and legality in transactions between men; and if a party would pursue his remedy therein, his demand must not rest on a violation of law for its foundation, or arise from his own illegal acts, or conduct *contra bonos mores.*"

See 19 Ohio Jurisprudence, 901, Sections 60, 65 and 78.

It is pointed out in other Ohio decisions that, if a

plaintiff by invoking the equity powers of the court could prevent the proper execution of the law by the enforcing officers, this would lead to great mischief.

We therefore conclude that when it appears that the scheme involved is prohibited by the statutes, the plaintiff can not appeal to a court of equity to protect it from the consequence of its own illegal act.

While we have not read all the cases cited, we have examined enough to conclude, without reservation, that the scheme presented by the petition is, as a matter of fact, a scheme of chance forbidden by the Ohio statutes.

*Demurrer sustained and cause remanded.*

HORNBECK, P. J., and BARNES, J., concur.