# ALBERT LEA AMUSEMENT CORPORATION v. RUDOLPH HANSON AND ANOTHER.[1]

June 23, 1950.

No. 35,116.

[1]Reported in 43 N. W. (2d) 249.

*Meighen, Knudson, Sturtz & Peterson, Samuel P. Halpern,* and *James E. M. Gottlieb,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Lowell J. Grady,* Assistant Attorney General, *Kenneth W. Green,* Special Assistant Attorney General, and *Rudolph Hanson,* County Attorney, for respondents.

THOMAS GALLAGHER, JUSTICE.

Plaintiff seeks a declaratory judgment construing M. S. A. 614.01, which provides:

"A lottery is a scheme for the distribution of property by chance among persons who have paid, or agreed to pay, a valuable consideration for the chance, whether it shall be called a lottery, raffle, gift enterprise, or by any other name, and is hereby declared unlawful and a public nuisance.

"Every person who shall contrive, propose, or draw a lottery, or shall assist in contriving, proposing, or drawing a lottery, shall be punished by imprisonment in the state prison for not more than two years, or by a fine of not more than $1,000, or by both."

Plaintiff, the operator of all commercial motion picture theaters in Albert Lea, for some years prior to the commencement of this action had adopted, evolved, and used a gift plan in connection with the theater business whereunder certain cash prizes were given to the holders of certain numbers each week. It is plaintiff's contention that the plan under which it operated did not constitute a violation of § 614.01, but was entirely legal. Some time prior to this action, defendants, in their official capacity, notified plaintiff that unless it ceased to operate such gift plan, frequently designated as "bank night," criminal proceedings under the foregoing statute would be instituted against it. Solely because of this threat, plaintiff discontinued the operation and commenced the present action. At the close of the testimony, the trial court made findings and ordered judgment in favor of defendants. Subsequently, upon plaintiff's motion for amended findings or a new trial, the trial court amended its findings, setting forth the facts in greater detail, but otherwise denied plaintiff's motion.

The plan evolved, the validity of which this court is now called upon to determine, as established by the findings of the trial court, is as follows:

"The Bank Night drawing was held on the stage of plaintiff's New Broadway Theatre on Thursday night of each week. For about six weeks before the first drawing in December, 1934, the plan, including the first nine rules set forth in paragraph 10 (b) of the complaint, was extensively advertised locally by the general dis-

tribution of hand bills around the City, by posters outside the theatres, by motion picture trailers at the shows and by going from place to place, to homes, business houses, stores and hotels with a registration book and inviting people in general to register, explaining that it would not cost them anything. A registration book was thereafter kept on a table or stand in the lobby of the New Broadway Theatre with said first nine rules posted in plain view.

"Plaintiff furnished the prizes for such drawings at the rate of $50.00 each week until a maximum of $1,000 in prizes was offered. If no winner qualified at any given Bank Night drawing, the sum of $50.00 would be added by the theatre to the amount theretofore advertised to be given away, and such gross amount would constitute the prize offered at the drawing on Thursday night of the following week. The prize, if no winner thereof qualified, would accumulate from week to week until it reached the sum of $400. If no winner qualified for the prize when it reached $400, then a second prize would commence to accumulate at the rate of $50 per week until the second prize, if not won by a qualified winner, would reach a total of $400. Thereupon, if no award had taken place, a third prize would commence to accumulate at the rate of $50.00 per week until the third prize had reached a limit of $200.00. By that method it was possible, as oftentimes happened, to have three prizes, aggregating $1,000, offered on a given Bank Night; one prize for $400, a second for $400, and a third for $200. The gross sum of $1,000 was made the limit for the gross prizes.

"Commencing about 1942, Rule No. 10, set forth in the complaint, was added to the other nine rules. It was publicized by motion picture trailers at the shows and was prominently displayed at the table in the theatre lobby where registrations were made. It provided that any person could obtain an 'absentee card' (sometimes identified as a 'Bank Night Identification Card') by calling at the theatre during business hours of the day before Bank Night and until 4:00 P.M. of the day of Bank Night. Business hours, for such purposes, were from 1:30 P.M. to 4:00 P.M. and from 6:30 P.M. to about 11:00 P.M. These 'absentee cards' were

placed on a table in the lobby of the theatre. A person executing the 'absentee card' left it on the table, and an attendant would from time to time gather these 'absentee cards' and file them alphabetically in a file kept for that purpose. At the time of the Bank Night drawings on the stage, this file was consulted, and, if the number drawn had been assigned to a person who subscribed to such an 'absentee card' so filed, such absentee winner would have 48 hours after the drawing and announcement of his name to call at the theatre, identify himself, and claim the prize. If the number of a person who signed an 'absentee card' was drawn, plaintiff attempted to locate such winner immediately after the drawing. If such winner was located, he was required, within 48 hours of the drawing at which his name was drawn, to identify himself as the winner and claim the prize, but he was requested to, and invariably did, come to the Bank Night drawing on Thursday evening of the succeeding week and receive his prize. After each drawing, the remaining 'absentee cards' were destroyed, and anyone wishing to again participate in the drawing by way of 'absentee card' was required to fill out another 'absentee card' within the time limited preceding the next drawing. Whereas registration was permanent in the sense that one registered but once, the 'absentee card' expired with each weekly drawing.

"A person could register without the purchase of an admission ticket. The registration book was kept on a stand in the outer lobby of the New Broadway Theatre, where any person not under 18 years of age might register at any time while the theatre was open.

"If a participant wished to be present in the theatre at the time of the drawing, he was required to purchase an admission ticket. A winner who stood in the lobby or on the sidewalk outside the theatre or who had executed an 'absentee card' could enter the theatre for the purpose of identifying himself and claiming the prize without purchasing an admission ticket.

"No registrations were made at the ticket window in connection with the purchase of admission tickets and no coupons, numbers,

'absentee cards' or other items connected in any way with the Bank Night drawings were handled at the ticket window.

"Persons wishing to participate in a drawing were required to sign a register. The signatures were posted in a permanent record book and a number was assigned to each signature. Tickets, or small cards, bearing these numbers were placed in a receptacle or drum. The original registrations were made upon ordinary composition books and the registrant had no connection with, or knowledge of, the posting in the permanent record books, the assignment of numbers, or the placing of the numbers in the drum. Registrations were listed in the permanent record books both serially and by alphabetical listing. No second registration by the same person was permitted.

"On Bank Night, at 9:00 o'clock P.M., this drum was placed on the stage of plaintiff's New Broadway Theatre. A disinterested person, chosen from the audience, would draw one or more tickets from the drum, depending upon the number of prizes offered. This ticket so drawn would then be handed to another disinterested person, chosen from the audience, who would identify from the registration book, the name of the person to whom a number had been assigned. An attendant then would announce from the stage the name of the person whose number had been drawn. If the person was in the theatre and claimed the prize, it would be given to him.

"At the drawing, an employee on the stage checked the 'absentee cards', averaging about 500 to 700, each drawing; and if an absentee has won, announcement of that fact is made to the audience and that his prize will be awarded on the following Thursday night. Immediate attempt is then made by the management to locate such absentee and advise him he has won the prize. Approximately 25% to 30% of the winners during recent years used 'absentee cards' and did not attend the drawing or wait in the nearby street; and approximately 25% of the winners were persons waiting in the lobby or in front of the theatre at the time of the drawing. The name of the winner was also announced in the lobby of the theatre and out on the sidewalk in front of the theatre. Persons whose

names were announced were requested to identify themselves within two and one-half minutes from the time of the drawing and the announcement of their names, except holders of 'absentee cards'.

"(6)  The prize or prizes offered by plaintiff at its Bank Night were paid, directly or indirectly, from paid admission receipts of the theatre. The plaintiff owns the theatres in Albert Lea and other theatres. It has a central bookkeeping division at the main office to which the receipts are sent and from which the Bank Night prizes are paid.

"(7)  The purpose and accomplished result of plaintiff's Bank Night scheme was, not only to advertise its Albert Lea theatres and attract patrons, but also, and more importantly, to increase the receipts from paid admissions to the theatres. While the increase in patronage was noted on other evenings throughout the week, the increase in paid admission attendance at the Broadway was greater on the drawing nights than on other nights of the week. The operation of plaintiff's Bank Night scheme resulted usually in a full house of paid admissions at the Broadway on Bank Night, usually greater than on other nights except Saturdays and Sundays. As the amount of the prize offered increased, there was a corresponding increase in the Broadway attendance on Bank Night."

As previously stated, based upon the foregoing facts, the trial court concluded that the plan as above outlined constituted a lottery within the meaning of § 614.01, which the court held to be valid and constitutional, and denied the injunctive relief sought by plaintiff.

This is an appeal from an order denying plaintiff's motion for a new trial.

■  Under § 614.01, a lottery is defined as "a scheme for the distribution of property by chance among persons *who have paid, or agreed to pay, a valuable consideration for the chance,* \* \* \*." (Italics supplied.) There have been a large number of decisions involving various forms of "bank night" and similar plans under statutory or constitutional provisions entirely dissimilar to the

above definition of a lottery.[2] We shall not consider such cases, in view of the fact that we have previously construed § 614.01, and, since statutory provisions similar thereto have been construed by courts of other states, these latter opinions form the basis for our present determination.

A number of courts have upheld the validity of the present plan under similar statutory provisions. They have done so upon the theory that no statutory violation is established in the absence of a showing that consideration for the chance to participate was *paid by any of the participants,* either through ticket purchases or otherwise. In these cases, the fact that the plan is conducted so as to profit the theater owner is held to be of no concern, since the specific statutory prohibition is only against consideration being paid by the *participants.* See, People v. Cardas, 137 Cal. App. Supp. 788, 28 P. (2d) 99; State ex rel. Stafford v. Fox-Great Falls Theatre Corp. 114 Mont. 52, 132 P. (2d) 689; State v. Eames, 87 N. H. 477, 183 A. 590; People v. Shafer, 160 Misc. 174, 289 N. Y. S. 649. The reasoning supporting this line of authority is well expressed in the Eames case as follows (87 N. H. 479-480, 183 A. 591-592):

"* * * Although signing one's name in a book or appearing at the theater within five minutes of the time of the drawing might be regarded as consideration, it cannot be called 'pay' without warping that word out of all recognition. For purpose of creating a lottery, consideration must be something of value.

\* \* \* \* \*

"The second group of cases (and it is the larger) [upholding validity], appear to be supported by better reason. They hold that indirect benefit to the operator of the scheme, standing alone,

[2]These cases are included in the cases cited in footnotes 4 and 5 of the dissent, with the exception of State ex rel. Beck v. Fox Kansas Theatre Co. 144 Kan. 687, 62 P. (2d) 929, 109 A. L. R. 698; State ex rel. Draper v. Lynch, 192 Okl. 497, 137 P. (2d) 949; State v. Jones, 44 N. M. 623, 107 P. (2d) 324, which are based upon statutory provisions similar to M. S. A. 614.01. These cases are hereinafter referred to.

is not enough but that to constitute consideration, individual participants, by and large, must contribute value for the chance. * * * Participation must be free in actual fact, not in theory only, and giving away a few free chances will not save a scheme otherwise objectionable."

■ There have been a number of decisions under similar statutes wherein plans similar to the instant one have been declared invalid because of evidence showing that the sponsor of the plan had increased his paid theater patronage as a result thereof, the latter being deemed sufficient consideration to render the plan invalid. State ex rel. Beck v. Fox Kansas Theatre Co. 144 Kan. 687, 62 P. (2d) 929, 109 A. L. R. 698; State ex rel. Draper v. Lynch, 192 Okl. 497, 137 P. (2d) 949; State v. Jones, 44 N. M. 623, 107 P. (2d) 324.

■ In other cases, the plan has been rejected because of a finding that participants, or some of them at least, paid a consideration for the right to participate in the chance to win a gift by the purchase from the sponsor of theater tickets with participation coupons, even though the plan provided for participation without charge, the latter fact being more or less concealed from the public. Blair v. Lowham, 73 Utah 599, 276 P. 292; State v. Danz, 140 Wash. 546, 250 P. 37, 48 A. L. R. 1109; State v. Schubert Theatre Players Co. 203 Minn. 366, 281 N. W. 369.

■ State v. Schubert Theatre Players Co. 203 Minn. 366, 281 N. W. 369, relied upon by respondents, commits this court to the theory expressed in the above cases which uphold the validity of plans under which the participants are *not* required to pay *any* consideration for the right to participate, even though the paid theater patronage of the sponsor may be increased as a result of such plans. There, we held that the plan submitted was invalid because a *part* of the group participating did so *by virtue of the purchase of tickets to which were attached participation coupons rendering the holders eligible for the drawing,* a factor entirely absent in the instant case. There, we held that since a part of the participants thereby actually paid for the chance of participating

it was immaterial that under additional phases of the plan others might obtain such coupons in the lobby without charge, and, if successful, enter the theater without tickets to claim their gifts. There, however, we rejected the theory that the resulting increase in paid theater admissions from the plan was, in itself, sufficient to constitute consideration so as to render it invalid under the statutory definition. Therein we stated (203 Minn. 368, 281 N. W. 370):

"* * * Of course a person may distribute or give away his property or money by lot or chance provided he does so without a consideration. But the moment some pay for the chance of participating in the drawing of the prize it is a lottery under the law, no matter how many receive a chance also to participate free and without any consideration. *Whether the lottery is so conducted as to be profitable to the operator thereof is no concern of the law.*" (Italics supplied.)

It is obvious that the distinctions between the plan in the Schubert case and the one now presented are of vital significance when the language of § 614.01 is considered. In the former, participants did pay for the chance to participate. In the latter, no consideration whatever passes from them to the sponsor of the plan for the right to participate.

▇ Under the foregoing authorities, and in particular our position in the Schubert case, we believe that the plan submitted by plaintiff, as outlined in the trial court's findings, does not constitute a lottery under § 614.01. Thereunder, the property which plaintiff distributes does not go to anyone by reason of *payment* for the right to participate in the drawing, since no *payment* is required for the privilege. Nor does any part of the entire group participating pay any consideration for the chance to participate. Registration in the lobby is the sole requirement for eligibility. No charge is made therefor. No ticket purchase is required in connection therewith. Only one registration is permitted each person. Presence within the theater gives no greater or additional opportunity for success. *Tickets to the theater performance may*

*be purchased, but no coupons of participation are attached thereto,
and the holders thereof remain ineligible to win a gift if they have
not previously registered in the lobby.*

A winning registrant may enter the theater without charge when
his name is called from the loud-speaker outside the theater. At
no stage of the proceedings does his status or the status of any
part of the group of participants change from that of a free to
that of a paid classification. There is no "moment" when "some
pay for the chance of participating in the drawing of the prize,"
as specified in the Schubert case. Presence in front of the theater
is not required. Absentee cards may be signed without charge,
giving any winner an additional 48 hours to claim his gift.

The price of admission is the same on the night of a drawing
as on other nights. The quality of the motion picture is not
changed. The money used in the distribution of the gift is looked
upon as an expenditure for advertising purposes. The evils pres-
ent in gambling and lottery schemes which invite the purchase
of numerous or costly chances by those eager to participate, with
consequent waste of earnings or savings, are not present here.
There is no cost for participation, no opportunity for waste of
funds or effects. No harm to anyone has been suggested or revealed
in the plan, unless there be something evil in the desire inherent
in every human to obtain something for nothing. If the latter is
true, then under the statute involved we must also condemn radio
"give away" programs, free prizes at store openings, church-dinner
door prizes, and gifts of like nature. We doubt that, in the ab-
sence of specific legislative direction, judicial sanction should be
given to any such narrow concept of morality.

■ In its complaint, plaintiff seeks an order enjoining defend-
ants, and each of them, from in any manner enforcing against
plaintiff § 614.01 by reason of any act arising out of the aforesaid
plan of bank night. Our decision has indicated that the plan
adopted is legal. We feel that this opinion will remove any threat
of interference with plaintiff's plan which would necessitate in-

junctive relief. For that reason, we deem it advisable to omit any discussion of that issue at this time.

The order appealed from is reversed with directions to the trial court to make its conclusions of law and order for a declaratory judgment in accordance herewith.

MATSON, JUSTICE (dissenting).

I dissent. Unless we expressly overrule State v. Schubert Theatre Players Co. 203 Minn. 366, 281 N. W. 369, plaintiff's bank-night scheme must be held to be a lottery. There is no difference in substance between the facts here and those of the Schubert case.

In the Schubert case, the purchaser of a theater admission ticket received from the ticket seller a separate coupon bearing a serial or identification number. These coupons were also given *free* to non-purchasers of tickets who called at the theater and requested them. All coupon holders, whether ticket purchasers or not, participated in the drawing on bank night, but those without admission tickets were not admitted to the theater to witness either the show or the drawing. The ticketless coupon holders were permitted to stand in the theater lobby or on the sidewalk outside, where they could hear the announcement of the lucky number. Any coupon holder in the lobby or on the sidewalk whose number was called was admitted free to claim the prize.

In the instant case—which for convenience we shall call the Albert Lea case—the same device was used behind a more elaborate facade. The ticket seller did not give ticket purchasers or others a coupon with an identification number. Instead, identification by number was accomplished by assigning a permanent number to each potential bank-night participant through a system of registration. Any person, whether he purchased an admission ticket or not, could acquire a permanent registration number by signing the register in the theater lobby which he was invited to do by an appropriate sign. As a result, each bank-night participant was relieved for all time of the inconvenience of having to obtain each week a new identification coupon or card. As the holder of a permanent identification number, he could (like any coupon holder in

the Schubert case) become the winner of the prize if his number was drawn from the receptacle which contained the numbers of all registrants. He need not even remember his number, because when the lucky number was drawn it was checked with the register and the winner was called by name. In order to receive the prize, however, he, *like any winner in the Schubert case,* had to be present in the theater as a ticket-holding patron or stand outside in the lobby or on the sidewalk ready to dash in to claim the winnings within two and one-half minutes after the announcement of his name,[3] *subject to the following exception.* If a would-be participant who had acquired an identification number by registration did not wish to buy an admission ticket, and furthermore did not wish to stand in the lobby or on the sidewalk with the other nonpaying participants, he could come to the theater once a week during certain business hours and sign an absentee card, which entitled him to notification if he was a winner and to an extension of time from two and one-half minutes to 48 hours in which to claim the prize. In other words, unlike the nonticket-buying participants in the Schubert case, members of the Albert Lea nonpaying group could escape the rigors of standing in the lobby or on the sidewalk by qualifying as a potential winner *in absentia* by each week obtaining an absentee card. Aside from the superficial trimmings of permanent registration (which is nothing but a substitute for identification by numbered coupon) and the privilege of becoming an absentee winner, the controlling facts in the Albert Lea bank-night scheme are the same as those in the Schubert case.

A lottery has three essential elements, namely (1) a *prize,* (2) the prize must go to a winner by *chance,* and (3) participants in this game of chance must pay a *consideration* for the chance. It is conceded that the first two elements of *prize* and *chance* are both present. Plaintiff contends that the third element, *payment of a consideration* by the chance-taking participants, is absent. In the Schubert case, we held that *the test is whether those participants who paid the regular price for admission to the theater were paying*

---

[3] In the Schubert case, five minutes was allowed.

*in part for the chance of a prize.* In that case we said (203 Minn. 368, 281 N. W. 370):

"\* \* \* Of course a person may distribute or give away his property or money by lot or chance provided he does so without a consideration. But *the moment some pay for the chance* of participating in the drawing of the prize *it is a lottery* under the law, *no matter how many receive a chance also to participate free and without any consideration.* Whether the lottery is so conducted as to be profitable to the operator thereof is no concern of the law. It is safe to say that a jury would have no difficulty to find in this 'Ten-O-Win' consideration paid by those coupon holders who gained entrance to the theater by the admission fee, that fee being looked to by the operator not only to furnish the prize, but a profit which he could not hope for in the absence of the 'Ten-O-Win' scheme. And, as far as the free distribution of coupons to participate upon request, we apprehend the jury could readily find that to be an attempted device to evade or circumvent the law. \* \* \* in State v. Stern, 201 Minn. 139, 275 N. W. 626, \* \* \* We \* \* \* approved as sound the decision in Commonwealth v. Wall, 295 Mass. 70, 73, 3 N. E. (2d) 28, 30. To what was there quoted we add this particularly pertinent observation:

" 'A game does not cease to be a lottery because some, or even many, of the players are admitted to play free, so long as others continue to pay for their chances. \* \* \* So here *the test is not whether it was possible to win without paying for admission to the theatre. The test is whether that group who did pay for admission were paying in part for the chance of a prize.' "* (Italics supplied.)

In State v. Stern, 201 Minn. 139, 144, 275 N. W. 626, 629, we said:

*"Whether a consideration is given for the chance of the prize is a question of fact.* Where one who purchases an admission ticket for a bank night obtains free another ticket to participate in the chance for the prize, the court affirmed a conviction of the operators of the theatre for maintaining a lottery." (Last sentence quoted is

based on People v. Miller, 271 N. Y. 44, 2 N. E. [2d] 38.) (Italics supplied.)

As a matter of common sense, it is wholly immaterial—unless form is to be mistaken for substance—whether the right to participate in the chance for a prize, which accompanies the purchase of a ticket, is physically represented by the presentation to the ticket buyer of a separate coupon with the chance-drawing number thereon, or whether the chance-drawing number is permanently assigned to the ticket buyer through a system of registration.[4] It is equally immaterial whether the ticket seller hands the ticket purchasers a number or whether the same thing is effected by a sign which invites purchasers and others to acquire a number by registration. Likewise, it is of no consequence that the use of absentee registration cards may have to some extent increased the number in the nonpaying group as long as another group paid in part for the chance of a prize. Many of the nonpaying registrants, through a sense of good sportsmanship, would be deterred from putting themselves in a position to draw a prize when they have contributed nothing by way of theater patronage or otherwise to bring the common stake or prize fund into being. Obviously, the trier of fact need not accept as genuine all the ingenious devices designed to give an *appearance* of *no consideration.*

---

[4]Many other jurisdictions attach no significance to the use of a system of registration. State ex rel. Hunter v. Fox Beatrice Theatre Corp. 133 Neb. 392, 275 N. W. 605; State ex rel. Hunter v. Omaha M. P. Exhibitors Assn. 139 Neb. 312, 297 N. W. 547; Furst v. A. & G. Amusement Co. 128 N. J. L. 311, 25 A. (2d) 892; State v. Jones, 44 N. M. 623, 107 P. (2d) 324 (overruling City of Roswell v. Jones, 41 N. M. 258, 67 P. [2d] 286); Troy Amusement Co. v. Attenweiler, 64 Ohio App. 105, 28 N. E. (2d) 207; State ex rel. Draper v. Lynch, 192 Okl. 497, 137 P. (2d) 949; City of Wink v. Griffith Amusement Co. 129 Tex. 40, 100 S. W. (2d) 695; Cole v. State, 133 Tex. Cr. 548, 112 S. W. (2d) 725; State v. Wilson, 109 Vt. 349, 196 A. 757; State ex rel. Cowie v. La Crosse Theaters Co. 232 Wis. 153, 286 N. W. 707; Stern v. Miner, 239 Wis. 41, 300 N. W. 738. Contra: State v. Horn, 16 N. J. Misc. 319, 1 A. (2d) 51.

We must bear in mind (1) that whether a consideration is paid is a question of fact; (2) that it is immaterial how large is the group which receives a chance without paying anything therefor *if another group does in fact pay;* and (3) that the acid test is whether the group that pays for theater admission tickets are paying in part for the chance of a prize. In the light of these principles which are controlling in this jurisdiction, unless our decisions reign only for the day they are issued, are we not compelled to affirm the trial court's determination that a lottery existed? With the elements of *prize* and *chance* admitted, the evidence fully sustains, if it does not compel, a finding that the ticket purchasers paid in part for the chance of a prize. It is undisputed that the increase in paid admission attendance was greater on bank nights than on any other weekday night. Significant indeed is the further undisputed fact that if no participant won at a weekly bank night, or at a consecutive number of bank nights, and therefore the prize money accumulated and increased in amount, the paid admission attendance increased in proportion to the increase of the prize money to be won. The more money there was to win the greater was the incentive to buy theater admission tickets. There is no suggestion that the quality of the motion picture increased in attractiveness or quality as the prize money increased. The increased attendance cannot be attributed to advertising, unless the attendance stimulus supplied by the increasing amount of prize money is to be called by that name. Labels may disguise, but cannot change, facts. That it was not true advertising, but plainly the desire for prize-money gain, which so motivated the increased attendance that the only inference to be drawn is that the ticket purchasers were paying in part for a chance to win, is confirmed by another significant item. When, in the face of threatened prosecution, the Albert Lea bank-night scheme was dropped, there was a *sudden* and *substantial* decline in the paid-admission patronage. This was expressly admitted by plaintiff's theater manager. When the chance to win a prize was gone, large numbers were no longer willing to pay the admission price for the limited purpose of seeing only the regular show. That the trial

court was right in finding that ticket purchasers were in part paying for a chance to win a prize is further confirmed by an admission contained in the theater manager's testimony when he said:

"Oh, yes, sure it does; there is no question about it. A lot of these people—well, I don't know, it is something that is born in you where *you like to get something for nothing, and that is where these bank nights come in,* you have got the people down to see our shows and so forth, *and as long as that element isn't there to attract them, they more or less have fallen off in attendance* as far as interest of the pictures are concerned." (Italics supplied.)

Increased paid attendance at a theater—over and above the normal attendance—which is motivated by the desire to acquire a chance to win a prize in a bank-night drawing, is of itself sufficient consideration, though it be indirect, to establish the existence of a lottery. United-Detroit Theaters Corp. v. Colonial Theatrical Enterprise, Inc. 280 Mich. 425, 273 N. W. 756; see, Affiliated Enterprises, Inc. v. Waller, 40 Del. (Terry) 28, 5 A. (2d) 257; State ex rel. Hunter v. Fox Beatrice Theatre Corp. 133 Neb. 392, 275 N. W. 605.

The Schubert case cannot be distinguished on the facts unless form is to be mistaken for substance. If we are not prepared to overrule the Schubert decision, the trial court's order denying a new trial should be affirmed. An examination of the authorities, as well as a reconsideration based on sound reasoning, leads to a conclusion that the Schubert decision is sound and is not deserving of repudiation. In accord with the Schubert ruling, it is significant that 21 other jurisdictions have likewise held bank-night schemes to be lotteries, even though presence in the theater was not necessary to win and even though a substantial number did not in fact pay for their chance as long as some who did pay for admission tickets were paying in part for the chance of a prize.[5]

[5]Grimes v. State, 235 Ala. 192, 178 So. 73; Affiliated Enterprises, Inc. v. Waller, 40 Del. (Terry) 28, 5 A. (2d) 257; Gulf Theatres, Inc. v. State ex rel. Ferguson, 135 Fla. 850, 185 So. 862; Little River Theatre Corp. v. State ex rel. Hodge, 135 Fla. 854, 185 So. 855; Jorman v. State, 54 Ga. App. 738, 188 S. E. 925; Barker v. State, 56 Ga. App. 705, 193

Knutson, Justice (dissenting).

I agree with the dissent of Mr. Justice Matson.

Mr. Justice Theodore Christianson, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

S. E. 605; Iris Amusement Corp. v. Kelly, 366 Ill. 256, 8 N. E. (2d) 648; State ex rel. Beck v. Fox Kansas Theatre Co. 144 Kan. 687, 62 P. (2d) 929, 109 A. L. R. 698; Commonwealth v. Wall, 295 Mass. 70, 3 N. E. (2d) 28; Commonwealth v. Heffner, 304 Mass. 521, 24 N. E. (2d) 508; United-Detroit Theaters Corp. v. Colonial Theatrical Enterprise, Inc. 280 Mich. 425, 273 N. W. 756; Glover v. Malloska, 238 Mich. 216, 213 N. W. 107, 52 A. L. R. 77; State v. McEwan, 343 Mo. 213, 120 S. W. (2d) 1098; State ex rel. Hunter v. Fox Beatrice Theatre Corp. 133 Neb. 392, 275 N. W. 605; State ex rel. Hunter v. Omaha M. P. Exhibitors Assn. 139 Neb. 312, 297 N. W. 547; Furst v. A. & G. Amusement Co. 128 N. J. L. 311, 25 A. (2d) 892; State v. Jones, 44 N. M. 623, 107 P. (2d) 324 (overruling City of Roswell v. Jones, 41 N. M. 258, 67 P. [2d] 286); Troy Amusement Co. v. Attenweiler, 64 Ohio App. 105, 28 N. E. (2d) 207; State ex rel. Draper v. Lynch, 192 Okl. 497, 137 P. (2d) 949; McFadden v. Bain, 162 Or. 250, 91 P. (2d) 292; City of Wink v. Griffith Amusement Co. 129 Tex. 40, 100 S. W. (2d) 695; Cole v. State, 133 Tex. Cr. 548, 112 S. W. (2d) 725; State v. Wilson, 109 Vt. 349, 196 A. 757; State ex rel. Cowie v. La Crosse Theaters Co. 232 Wis. 153, 286 N. W. 707; Stern v. Miner, 239 Wis. 41, 300 N. W. 738; State v. Danz, 140 Wash. 546, 250 P. 37, 48 A. L. R. 1109; State v. Greater Huntington Theatre Corp. (W. Va.) 55 S. E. (2d) 681. For list of cases pro and con, see Annotations, 109 A. L. R. 709, 103 A. L. R. 866, 57 A. L. R. 424, 48 A. L. R. 1115. Contra: State v. Horn, 16 N. J. Misc. 319, 1 A. (2d) 51.